BENTLEY and others vs. THE STATE.

*January 14 — January 29, 1889.*

*Building contracts: Sufficiency of plans and specifications: Warranty.*

Ch. 252, Laws of 1882, authorizing the construction of two transverse wings to the capitol, provided for a board of commissioners who should procure " suitable and proper plans, drawings, and specifications for the construction " of said wings, and let the contract for their erection. It also authorized them to employ an " architect or superintendent to superintend the work on said building " as it progressed, and to certify to the board monthly estimates of all materials furnished and labor performed. Pursuant to such act the board procured plans, engaged an architect, and entered into a contract with the plaintiffs whereby all the materials were to be furnished and all the work done according to the plans and specifications furnished by the board, and under the direction and to the entire satisfaction of the architect. The contract further provided that the architect might vary from such plans, and that any doubt as to the quality of materials or workmanship, or as to allowances for extras, should be determined and adjusted solely by the architect. After the plaintiffs had in good faith constructed a large portion of one wing, and the materials and work had been approved by the architect, accepted by the board, and paid for by the state, the wing fell by reason of latent defects in the plans. At the special request of the state the plaintiffs restored the wing according to amended plans and specifications furnished by the board. *Held,* that the state warranted the sufficiency of the original plans, and was liable to the plaintiffs for the expense of restoring the portion of the building so destroyed.

ACTION against the state, commenced in the supreme court pursuant to ch. 139. R. S. The following statement of the case was prepared by Mr. Justice CASSODAY:

Ch. 252, Laws of 1882, went into effect March 31, 1882, and authorized the construction of two transverse wings to the state capitol,— one on the north, and the other on the south,— to be built by contractors according to the plans and specifications therein provided for, and under the superintendence of an architect or superintendent therein authorized; the bid or bids therefor not to exceed, in the aggregate, $100,000 payable in 1882, and $100,000 payable in 1883. The said act also required the board of commissioners therein authorized to procure suitable and proper plans, drawings, and specifications for the construction of said buildings, and, after the adoption of the same, to advertise for twenty days for sealed proposals for the erection of said buildings; and that the contract therefor should be let by such board to the best responsible bidder or bidders, to whom such contract was to be awarded, and with whom it should be made.

The complaint alleges, in effect, that May 25, 1882, the said board of commissioners, having been fully appointed and duly organized, caused notice to be given that until June 15, 1882, at 10 o'clock A. M., sealed proposals in the form of a contract, for which blanks were furnished by said board, would be received by them for the construction of said two wings, designed by D. R. Jones, architect, and stating that plans and specifications therefor would be on exhibition at the office of said Jones, in Madison, after May 25, 1882; that the plaintiffs made a bid for such construction of said two wings in accordance with the blank contract furnished to them by said board; that when such proposals were opened, June 15, 1882, it was found that the lowest bid exceeded the amount of the appropriation therefor, and hence was not accepted; that prior to that time

said board had employed said Jones as such architect and superintendent, and had given him the general charge and control of the same and of the letting of the contract; that said Jones then and there twice successively changed said plans and specifications, so as to make said wings cheaper than originally designed, and said board requested the plaintiffs and others to again bid on the same according to such altered plans; that, while the plaintiffs were required to enter into a contract for the doing of the whole work, it was well understood that large portions of the material were to be furnished by subcontractors, who made their bids therefor, and who were then and there present and modified their bids according to such altered plans and specifications; that among other things there was to go into said building a large quantity of cast-iron work, minutely described in said specifications, which was to be made and furnished by a subcontractor; that one James Fyfe, of Portage, Wisconsin, did then and there figure and bid on such work, and make the lowest bid for the same; that these plaintiffs did not know said James Fyfe, but said Jones, who knew him, told the plaintiffs that he was reliable, and requested these plaintiffs to accept his bid for such cast-iron work, and they did so at his request, requiring said Fyfe to furnish the same according to the said specifications and contract, by which all the material furnished was subject to the approval of said Jones, the superintendent of the building; that these plaintiffs did thereupon make the bid of said James Fyfe for cast-iron work the basis of their calculation, and bid for the whole work, and that upon their final bid so made after the said several modifications of said plans and specifications the contract was let to them, and that they then, with the approval of said Jones, let the cast-iron work to said James Fyfe; that, omitting the formal parts, the plaintiffs, as parties of the first part, and the state of Wisconsin, as party of the second

part, June 16, 1882, made, entered into, and executed the following

" CONTRACT.

" That the said party of the first part hereby agrees to furnish all the materials and perform all the work required to erect and complete the building of two transverse wings to the present state capitol at Madison, in the state of Wisconsin, and to do everything necessary and required to be done in, to, and about said building, according to the plans and specifications made for the same by D. R. Jones, architect; which plans and specifications are signed by the said Jones and dated May 25, A. D. 1882, and which were twice revised by the said Jones, architect, and Henry Koch, consulting architect, on the 15th day of June, 1882, and after such revision were adopted by the said commissioners.   All the work shall be executed in a thorough, complete, and most workmanlike manner, and agreeably to such directions as may be given from time to time by said D. R. Jones, architect and superintendent (or such persons as may be employed by the party of the second part to superintend the work), and to such superintendent's full and entire satisfaction, without reference thereon to any other person.

" If any alteration should hereafter be made by order of the party of the second part or their superintendent, which they may deem necessary, varying from the plans and specifications as revised as aforesaid, either by adding thereto or diminishing therefrom or otherwise however, such alterations shall not vacate the contract hereby entered into, but the value thereof shall be ascertained by said superintendent and added to or deducted from the sum of money hereinafter mentioned as the case may be; nor shall such alterations, either in addition, diminution, or otherwise, supersede the condition for the completion of the whole of the work at the time herein expressed, but the party of the first part shall, if such alterations of whatever sort require

it, increase the number of his workmen so that the same, as well as the work contained in the plans and specifications as so revised as aforesaid, shall be completely finished and so delivered up to the party of the second part, clean and in good order for use, by the 1st day of January, A. D. 1884; and the said party of the first part shall have all wood, flooring, and joists, and roof timber, necessary for the building, piled in the city of Madison, outside of the capitol grounds, before the 1st day of November next (1882), all flooring to be covered from the weather; and shall also have all doors, sash, inside and outside finishing lumber, prepared in readiness for putting up before the 1st day of April next,—it being the intention to thus secure better seasoned wood.

" If any doubt or doubts should arise as to the quality of materials being used, or of the workmanship, during the execution of the work, or as to estimating allowances for extra material or work (should any occur), or making out the accounts as to such extras, or other work for which the party of the first part may think he has a claim over and above the sum hereinafter mentioned, the admission or allowance for such materials or work, or of any such claim or claims, shall be judged of, determined, and adjusted, solely by the superintendent; it being the intention of the parties to this contract that all such work of every kind that may be necessary for completely finishing the work proposed, or for the rectification of any failure from whatever cause arising, and the well maintaining, sustaining, and supporting the whole work, as well as alterations and additions, should such be made, so that the whole may remain sound and firm, are implied in the aforesaid specifications as so revised as aforesaid, although the same may not therein be specifically expressed; and it is hereby agreed that on this, as well as on all other matters of difference, no reference to any other person than the superintendent is to

be allowed or admitted, and his determination shall be final and conclusive.

"The masonry to the bottom of the water-table, but no further than to the top of the principal or first story, shall be laid on or before the 10th day of November, 1882, and securely protected from injury by the weather, during the season of frost, by a covering of plank, and said masonry shall also be well banked with earth to protect it from water.

"If the party of the first part should neglect or refuse to carry on the work with such dispatch as shall be thought necessary by the superintendent to complete the same by the time hereinbefore mentioned, or should neglect or refuse to furnish such materials for or to do the work as by the superintendent directed, it shall be lawful for the party of the second part, or their superintendent, to employ such other person or persons as said party of the second part shall think fit or necessary to furnish such unprovided materials, or to finish any of the unfinished work, after having given notice in writing to the party of the first part, three days before employing such person or persons; said notice to be left at the shop, counting-house, or usual place of abode of the party of the first part, or delivered to the foreman on the work; and the bill or bills of any artificer that may be so employed, or for materials furnished, and all expenses incidental thereto, shall be deducted out of any money that may be due or to become due on this contract, and owing to the party of the first part, or any part thereof, as the case may be; and in case of a deficiency the party of the first part and his sureties shall be held liable therefor; and the said superintendent is hereby empowered to have any material which he may reject removed from the premises forthwith, to secure its non-usage.

"No part of the work covered by this contract is to be

relet or subcontracted without the consent in writing of the party of the second part.

"In consideration of the faithful performance by the party of the first part, as above stated, the party of the second part agrees to pay the party of the first part, on the certificate of the superintendent, as follows, viz.:    In all, the gross sum of $188,370, to be paid in manner as follows, to wit: Eighty five per cent. of the proportionate value of the work done, monthly, as the work progresses, on the estimates of the superintendent; and the remaining fifteen per cent., together with all other sums, if any, due on this contract, shall be paid on the completion and acceptance of the entire work as herein contracted for, or as soon thereafter as the said commissioners are satisfied that said work is completed and are assured against the existence of any mechanic's lien on said building: provided, however, that no materials shall be estimated or paid for until upon the grounds and suitable to be used in the permanent construction of the building, except for such materials as are herein required to be piled in the city of Madison outside of the capitol grounds."

The complaint further alleges "that by the contract and specifications said D. R. Jones was given complete control and superintendence over said building, and made the sole judge of all materials furnished and labor done.   And the plaintiffs further show that they proceeded to perform their said contract according to the plans and specifications, and under the directions of said D. R. Jones; that they had reason to believe, and did believe, that said building had been properly planned by said Jones, the architect and agent of the state of Wisconsin, and proceeded with said building in good faith; that by the 8th day of November, A. D. 1883, these plaintiffs had a very large portion of said two wings completed, and had placed therein a large quan-

tity of cast-iron material furnished by said James Fyfe, which had been approved and accepted by said D. R. Jones on behalf of the state of Wisconsin; that on said day one of said two wings broke down and fell, destroying a very large amount of material, and the fruits of a very large amount of labor bestowed thereon by these plaintiffs; that all of the material and work so destroyed and lost had been by said architect, prior to the falling of said building, approved and accepted, and had been accepted by said board of commissioners, and paid for by said state upon the certificates of said architect.

" And these plaintiffs allege, upon information and belief, that said wing broke down and fell by reason and in consequence of defects in the plans and specifications so prepared by said D. R. Jones, and in accordance with which the same was required to be constructed; that said plans and specifications were especially defective in respect to such cast-iron work, among other particulars, in failing to provide a proper plan for the construction of the same, with respect to bearings and supports for columns and girders, and in failing to provide for proper plates for certain piers and parts of corridor walls upon which iron columns supporting great weights were to and did rest; that said plans and specifications required that such plates should be one inch in thickness, and of the size of the bases of the columns, which was in all cases less than twelve inches square; whereas these plaintiffs, upon their present information and belief, allege that said plates for said piers and parts of corridor walls should have been two feet square, and more than one inch in thickness; that said plans and specifications also provided that lines of iron girders, extending from end to end of said south wing, should be placed upon the caps of the lower tiers of columns for the support of other tiers of columns, lines of girders, floors, and other heavy portions of said building above; that the upper and

lower surfaces of such lines of girders were required to be of the width of about eight inches, and each comprised several lengths,— each length consisting of two iron girders or joists, bolted together side by side; that such lines of girders were required to be so placed upon the caps of the lower tiers of columns that the ends of each of such lengths should have its bearing and support upon the cap of one of such columns, except in cases where the ends of such lines of girders extended into walls, in which cases they were to be and were anchored to such walls; that such iron plates of the size aforesaid were required to be placed upon the upper surfaces of such lines of girders, over the columns beneath, and over the joints where the ends of such lengths came together as aforesaid, and the bases of the next tier of columns above were to be and were placed on these iron plates; that it was further required by said plans and specifications that the ends of such lengths, composing these lines of girders, should be connected and fastened together where they rested on the caps of columns as aforesaid by means of iron straps bolted to the ends of each of such lengths.  And these plaintiffs, upon their present information and belief, allege that by reason of the contraction and expansion of such lines of girders, and of the impracticability of obtaining unchangeable and perfect bearings for the support of the bases of such columns in the manner aforesaid, such plan of construction, arranging, and adjusting such columns, plates, and girders was defective and insufficient.

"And these plaintiffs allege that they did not at the time of the construction of said building, and before the fall thereof, know that said plans and specifications were defective and insufficient in any respect, but that they relied upon the same as being in all respects sufficient, and upon the skill and judgment of said architect, and put in said plates, columns, girders, and other iron-work as constructed by said

Fyfe, approved and accepted by said Jones, and as required by said plans and specifications.   And these plaintiffs, upon information and belief, allege that by reason of the defects and insufficiencies aforestated, and without fault or negligence on the part of these plaintiffs, the said south wing broke down and fell as aforestated; that said plans and specifications were defective and insufficient in other respects.

"And these plaintiffs allege that after such breaking down and fall of said building other architects were employed by the state of Wisconsin, and thereupon extensive amendments to the plans and specifications were made on behalf of the state of Wisconsin, both for the north wing and the said south wing, whereby the same were greatly strengthened, and at large additional cost and expense, and that alterations were then made and said building finished by these plaintiffs, at the special request of the state of Wisconsin, in accordance with such new amended plans and specifications; that such work was done under the direction of said board of commissioners; that in doing the same these plaintiffs were obliged to expend, and did expend, the sum of $22,038.20 for labor and materials in restoring so much of said south wing as had been finished and was destroyed by said fall, which had occurred in consequence of the carelessness and want of skill of the architect, the agent of the state of Wisconsin as aforesaid, and without fault on the part of these plaintiffs; that said building was completed by these plaintiffs, and accepted by the state of Wisconsin, by the 29th day of November, 1884, and that said state has paid these plaintiffs for the same, except, however, for the cost and expense of restoring said south wing as aforesaid; that said architect unreasonably, and without just cause, refused to give these plaintiffs his certificate covering the work done and materials furnished by plaintiffs in rectifying such failure and restoring that

portion of said south wing which was destroyed by the fall thereof as aforesaid; that the plaintiffs have a just claim for the same, with interest from the 29th day of November, 1884; that they applied to the legislature of the state at the session of 1885, and again at the session of 1887, for the allowance and payment of the same, but the legislature refused to allow the same.

"Wherefore said plaintiffs bring this action against the state of Wisconsin, pursuant to the statute in such case made and provided, and demand judgment against the state for said sum of $22,038.20, with interest from the 29th day of November, 1884, and costs."

The complaint also stated, in effect, that the plaintiffs, deeming themselves aggrieved by the refusal of the legislature to allow their just claim against the state as aforesaid, pursuant to the statute in such case made and provided bring this their complaint against the state of Wisconsin, and allege as above set forth.

To such complaint the state demurred on the ground that said complaint did not state facts sufficient to constitute a cause of action.

For the plaintiffs there was a brief by *Wm. Ruger* and *F. C. Winkler*, and the cause was argued orally by *J. G. Flanders* and *Wm. Ruger*. They cited Bishop on Cont. secs. 246, 253, 1416–17, 1424; Wood's Master & Serv. secs. 155, 277, 282, 318, 321; *Kellogg Bridge Co. v. Hamilton*, 110 U. S. 108; *Clark v. Pope*, 70 Ill. 128; *Louisville, E. & St. L. R. Co. v. Donnegan*, 111 Ind. 179; *Seymour v. Long Dock Co.* 20 N. J. Eq. 396; *Schwartz v. Gilmore*, 45 Ill. 455; *Daegling v. Gilmore*, 49 id. 248; *Bonnet v. Glattfeldt*, 120 Ill. 166; *Horner v. Nicholson*, 56 Mo. 220; *People v. Stephens*, 71 N. Y. 527, 549–51; *Craker v. C. & N. W. R. Co.* 36 Wis. 669–74; Dillon on Mun. Corp. (3d ed.), secs. 459–60, 479, 938–9; *Grand Rapids & B. C. R. Co. v. Van Dusen*, 29 Mich. 431, 440–1; *Cleary v. Sohier*, 120 Mass. 210;

*Haynes v. Second Baptist Church*, 88 Mo. 285; *Hollis v. Chapman*, 36 Tex. 1; *Cook v. McCabe*, 53 Wis. 250; *Rawson v. Clark*, 70 Ill. 656; *Niblow v. Binsse*, 1 Keyes, 476; *Kingsley v. Brooklyn*, 78 N. Y. 200, 216; *Whelan v. Ansonia Clock Co.* 97 id. 293; *Rudd v. Bell*, 55 Wis. 563; *Burke v. Dunbar*, 128 Mass. 499; *Sinnott v. Mullin*, 82 Pa. St. 333.

The *Attorney General* and *L. K. Luse*, Assistant Attorney General, for the state, cited Lloyd on Building Cont. 88, 183, 186, 194; Roscoe's Building Cases, 50; Emden on Building Cont. 79, 138; *Thorn v. Mayor*, 45 L. J. 488; *Scrivener v. Pask*, L. R., 1 C. P. 715; *Sinnott v. Mullin*, 82 Pa. St. 333.; *Cannon v. Wildman*, 28 Conn. 473; *Clark v. Pope*, 70 Ill. 133; *Schwartz v. Saunders*, 46 id. 22; *School Trustees v. Bennett*, 27 N. J. Law, 513; *Sherman v. Bates*, 15 Neb. 18; *Loundsbury v. Eastwick*, 3 Phila. 371; *Bond v. Newark*, 19 N. J. Eq. 376–82; *Glacius v. Black*, 50 N. Y. 145–50; *Green v. State*, 8 Ohio, 314; *Adlard v. Muldoon*, 45 Ill. 193; *Pack v. New York*, 8 N. Y. 222; *Barry v. St. Louis*, 17 Mo. 121; *Painter v. Pittsburg*, 46 Pa. St. 213; *Corbin v. American Mills*, 27 Conn. 278; *Railroad Co. v. Hanning*, 15 Wall. 656.

CASSODAY, J. The only question raised by the demurrer is whether the complaint above set forth states facts sufficient to constitute a cause of action upon contract. The contract was only to be let after the state, through its board of commissioners, had procured and adopted "suitable and proper plans, drawings, and specifications " for the construction of the two wings of the capitol. Sec. 3, ch. 252, Laws of 1882. Such commissioners were expressly " authorized to employ an architect or superintendent *to superintend the work on said building as it progressed*," and for which he was to receive from the state such compensation as the commissioners should determine. Id. sec. 4. Such architect was thereby required, at the close of each month, to

make out estimates in detail of all materials furnished and labor performed during said month, and duly certify the same to the board, who, after having examined, approved, and recorded the same, and after deducting fifteen per cent. of the total amount, to be retained until the completion of the contract, were to certify to the correctness thereof, when the same was to be paid by the state. Id. sec. 5. It appears that such commissioners were duly appointed and organized as a board, and employed such architect on or before May 25, 1882. It also appears that on or before that date the state, through such board and architect, did undertake to procure and adopt such "suitable and proper plans, drawings, and specifications;" and thereupon gave the requisite notice of receiving sealed proposals in the form of a blank contract furnished by them for the construction of such wings according to such plans and specifications; and that it became necessary twice to modify and alter such plans and specifications in order to secure any bids for such construction within the appropriation; and that the contract was awarded to the plaintiffs.

The contract is given above. It appears that it required all the materials to be furnished and all the work to be done according to such plans and specifications, and agreeably to such directions as might be given from time to time by such architect, and to his full and entire satisfaction; that it expressly authorized the state or its architect to vary from such plans and specifications, either by adding thereto or diminishing therefrom or otherwise, and the value of such alterations were to be ascertained by him and to be added or deducted from the contract price named therein as the case might be; that such alterations and additions, as well as the work contained in the plans and specifications, were to be completed January 1, 1884; that any doubt or doubts as to the quality of materials being used or the workmanship thereon, or as to estimating allow-

ances for extra materials or work, or for the rectification of any failure from whatever cause arising, the same was to be judged of, determined, and adjusted solely by such architect, and such determination was to be final and conclusive. From the whole contract it seems to have been the duty of such architect, from time to time, as the work progressed, to inspect and approve or disapprove all material and workmanship as it went into the buildings; and the plaintiffs were bound by his determinations, and required to follow his directions. In other words, the contract gave such architect complete control and superintendence over such construction, and made him the sole judge of all materials furnished and labor performed. He was, moreover, thereby authorized and empowered to modify, change, and alter such plans and specifications as he might from time to time deem expedient; and the plaintiffs had no alternative, under the contract, except to follow his directions and conform to such modified, changed, and altered plans and specifications, but with the right to additional compensation for any and all extra materials and work required by such modifications, changes, and alterations.

Under the pleadings, we must assume that the plaintiffs proceeded in good faith to perform their said contract according to such plans and specifications, and under the direction of the architect, and without any knowledge of any defects or inefficiency; that on November 8, 1883, they had a very large portion of said two wings completed, and had placed therein a large quantity of cast-iron materials, furnished by a contractor selected by said architect, and which cast-iron materials had been approved and accepted by the architect on behalf of the state; that by reason and in consequence of defects in such plans and specifications, and without any fault or negligence of the plaintiffs, and on November 8, 1883, the south wing broke down and fell,

destroying a very large amount of material and the fruits of a very large amount of labor bestowed thereon by the plaintiffs; that all the material and work so destroyed and lost had previously been approved and accepted by the architect, and been accepted by the board of commissioners, and paid for by the state upon the certificates of the architect; that thereupon other architects were employed by the state, and extensive amendments to such plans and specifications were thereupon made on behalf of the state, both for the north and south wings, whereby the same were greatly strengthened, and at large additional cost and expense; that such alterations were. then made and the buildings finished by the plaintiffs, at the special request of the state, in accordance with such new amended plans and specifications; that such work was done by the plaintiffs under the direction of said board and said architect; that in doing the same they were obliged to expend, and did expend, $22,038.20 for labor and materials in restoring so much of said south wing as had been finished and was destroyed by such fall; that the building was completed by the plaintiffs and accepted by the state, November 29, 1884; that the state has paid for the same, except the amount last stated; that the architect unreasonably and without just cause refused to certify the work done and materials furnished in rectifying such failures and restoring such south wing.

Under such a contract, and upon such facts, it is strenuously urged upon the part of the state that the plaintiffs were bound to furnish all the materials and perform the necessary work to restore the south wing, according to such new or modified and altered plans and specifications, to the point and in the condition where it was when it fell, at their own cost and expense. In other words, the contention is that the plaintiffs assumed the risk of the sufficiency and efficiency of the plans and specifications, and the ma-

terials and workmanship thus exacted, approved, accepted, and paid for by the state; and hence must suffer and make good the loss occasioned by such defects. Under the contract, it is very manifest that, had the plaintiffs departed from such plans and specifications and refused to follow the directions of the architect, there could have been no recovery for the building of the south wing, even had they in the first instance built it as they were finally directed by the architect to do. On the contrary, they could only recover by furnishing materials and doing the work according to such plans, specifications, and directions, as they allege they did. The fall was not the result of inevitable accident, as in several of the cases cited by counsel. According to the allegations of the complaint, it was in consequence of inefficient and defective plans and specifications therein mentioned. According to such allegations, we must infer that there was in such agency of the state a lack of learning, experience, skill, and judgment to draw adequate and efficient plans and specifications for a building of that magnitude. But, as observed, the state, through its own chosen agency, undertook to furnish, for the guidance of the plaintiffs, "suitable and proper plans, drawings, and specifications for the construction" of such buildings, and then bound the plaintiffs to build according to them unless otherwise directed by its architect. Under the allegations of the complaint, we must assume that such inefficiency and defects were not patent to an ordinary mechanic, but were, as to the plaintiffs, latent. It is nevertheless contended that, if it were possible by means of temporary supports to have completed the buildings according to such plans and specifications, then the plaintiffs were bound to so complete them, unless sooner stopped through the agency of the state, even though they would have been worthless when so completed; and that since they were not so stopped, and the buildings were not so completed accord-

ing to such original plans and specifications, the plaintiffs were bound to suffer the loss and make the same good by restoration. In other words that, under the act authorizing the structures and the contract, the state was not bound to make good and was not responsible for the inefficiency and defects of what it thus undertook through its agency to furnish; but that the plaintiffs were bound to make good what they thus undertook to furnish and perform, notwithstanding the failure of such conditions precedent on the part of the state.

The case most relied upon in support of such contention is *Thorn v. Mayor*, L. R. 1 App. Cas. 120, affirming *S. C.* 44 L. J. Exch. 62. The facts in that case were to the effect that the city of London desired to remove an existing bridge over the Thames at Blackfriars, and erect a new one in its place. Accordingly its engineer prepared plans of such intended new bridge, and specifications of the works to be executed. The specifications stated, in effect, that the accuracy of the drawings of the existing bridge was not guarantied; that the city should not be liable for any extra work in removing more than indicated in the drawings; that the contractors were to take out their own quantities, and satisfy themselves as to the nature of the ground through which the foundations were to be carried; that no surveyor was authorized to act for the city, and that no information given was guarantied; that piers were to be put in by means of wrought-iron caissons, as shown on the drawings; that the contractors were to assume all risks and responsibility in the sinking of such caissons, and to employ their own divers or other efficient means for removing and overcoming any obstacles or difficulties that might arise in the execution of the work; that the quality of the concrete was put under the control and direction of the engineer; that extra or varied work was to be certified, accounted, and paid for at prices named. Thorn, having taken the

contract, entered upon the works according to such plans and specifications. After a while it transpired that such caissons were not sufficiently strong to resist the tide-waters, and accordingly it became necessary to alter the plans for shutting out the water while putting in the piers. This occasioned the loss of material and work, and necessitated extra material and work, and a considerable delay. The ordinary method at the time of shutting out such water was by means of coffer-dams. The city voluntarily paid the contract price, *and also voluntarily paid for the cost of the extra work rendered necessary by such alteration of the plans, but refused to pay for the contractor's loss of time and labor occasioned by the attempt to execute the original plans,* and the action was brought to recover what the city thus refused to pay. The question presented was whether there was any implied warranty on the part of the city that such caissons would prove efficient to shut off the water while building the piers. Each of the two courts cited above held that there was no such warranty, and hence that the city was not liable.

The value of such decisions as authority, however, is somewhat impaired by reason of the uncertainty as to the precise grounds upon which they were based. This grows out of the fact, so common among English decisions, especially of the present day, of rendering numerous opinions in the same case. Thus, in that case, there were five different opinions rendered in the Exchequer Chamber, and four in the House of Lords. Each of these opinions puts such decision upon grounds differing more or less from some if not all the others. The conclusions of each court, therefore, are to be found in the general average. The prevailing opinions in each of those courts seem to go on the theory that the contract was for the building of the bridge on piers; and that although the contract referred to the plans, etc., in which the caissons were specifically

described, yet that the caissons were merely an unusual mode of doing the work, which was likened to the scaffolding in building a house; and that in no event was there any express or implied warranty as to the efficiency of such caissons; that in the absence of any such warranty, and upon the facts stated, the plaintiff could not recover in that form of action, even if he could in some other form. Some of the opinions seem to go upon the theory that the contractor assumed the risk of the efficiency of the plans and specifications, while others seem to go upon the theory that, when the caissons proved themselves inefficient, the plaintiff was at liberty to decline further work under the contract, but that as he continued the work in the absence of any such warranty he was without remedy,— especially in that form of action. All the opinions seem to agree that the case, as brought and presented, necessarily turned upon the presence or absence of such a warranty or undertaking on the part of the city, which was found not to exist.

The facts of that case distinguish it from the one at bar in several particulars. In that case the caissons so specified were not included in the thing contracted for, but were only referred to in the specifications as a means to be employed in the construction of the piers. Here the defects and inefficiency were in parts of the structure contracted for. In that case the city's engineer only had control and direction as to a small portion of the work, in which the caissons were not included, but the construction was almost wholly under the control and supervision of the contractor and his engineer and employees. Here, as indicated, the state's architect was to inspect, approve, and accept the materials and workmanship as they went into the building, and did so accordingly, with full power to modify and alter plans and specifications. In that case the defective parts were never accepted by the city. Here they were inspected, ac-

cepted, approved, and paid for by the state. In that case the agency of the city, as to the defective parts, terminated with the drawing of the plans and specifications. Here the agency of the state continued, with the absolute right of control and supervision, during the entire execution of the works. In that case the contract expressly disclaimed any guaranty, risk, or responsibility as to several particulars, including the sinking of such caissons, and in removing and overcoming any obstacles or difficulties arising in the execution of the works. Here there is no such disclaimer on the part of the state, but a general assumption of the right to determine all questions relating to the material and workmanship. In that case the stipulation respecting compensation for extras seems to have been more limited than here. The cases may fairly be regarded as distinguishable in their facts. Certainly we are unwilling to apply the rules there announced by some members of the court to the facts here admitted by the demurrer. According to such facts, the state undertook to furnish suitable plans and specifications, and required the plaintiffs to conform thereto, and assumed control and supervision of the execution thereof, and thereby took the risk of their efficiency. What was thus done, or omitted to be done, by the architect, must be deemed to have been done or omitted by the state. Moreover, we must hold, notwithstanding the English case cited, that the language of the contract is such as to fairly imply an undertaking on the part of the state that such architect had sufficient learning, experience, skill, and judgment to properly perform the work thus required of him, and that such plans, drawings, and specifications were suitable and efficient for the purpose designed. There seems to be no lack of able adjudications in support of such conclusions. *Clark v. Pope*, 70 Ill. 128; *Daegling v. Gilmore*, 49 Ill. 248; *Schwartz v. Saunders*, 46 Ill. 18; *Seymour v. Long Dock Co.* 20 N. J. Eq. 396; *Sinnott v. Mullin*, 82 Pa. St. 333; *Smith*

*v. B., C. & M. R. Co.* 36 N. H. 459; *Grand Rapids & B. C. R. Co. v. Van Dusen,* 29 Mich. 431; *Burke v. Dunbar,* 128 Mass. 499; *Kellogg Bridge Co. v. Hamilton,* 110 U. S. 108. The case is not unlike in principle to a class of decisions frequently made by this and other courts, and recently sanctioned by the House of Lords, to the effect that where goods or machinery are ordered for particular use, to the knowledge of the manufacturer or vendor, there is an implied undertaking or warranty on his part that they will be fit for such use in the ordinary manner, and that in case of failure by reason of latent defects not discoverable by ordinary diligence upon inspection, such manufacturer or vendor is liable. *Drummond v. Van Ingen,* L. R. 12 App. Cas. 284.

*By the Court.*— The demurrer to the complaint is overruled, with leave to answer within twenty days.