312 So.2d 24

**BURGESS MINING & CONSTRUCTION CORP., a corp.**

v.

**CITY OF BESSEMER, Alabama, a Municipal Corporation.**

**SC 688.**

Supreme Court of Alabama.

March 6, 1975.

Rehearing Denied May 1, 1975.

Bainbridge & Mims, Birmingham, Stone, Patton & Kierce, Bessemer, for appellant.

McEniry, McEniry & McEniry, Bessemer, for appellee.

HEFLIN, Chief Justice.

Appellant-plaintiff Burgess Mining & Construction Corp. (Contractor) appeals from a judgment rendered in favor of the appellee-defendant City of Bessemer, Alabama, (City) on three counts of a complaint on which the Contractor sought to recover from the City the sum of $35,550.-94 for performing additional work under a contract to construct an airport for the City.

On November 25, 1969, the City entered into a contract with A. E. Burgess Company, Inc. (whose name was later changed to Burgess Mining & Construction Corporation) for the construction of an airport on a unit-of-work basis to be performed at a unit price, the total of which was estimated to be $571,221.40. The case was submitted to the trial court on the contract between the parties and other documents agreed to in open court without any oral testimony. By agreement of the parties, judgment was awarded the Contractor on Counts 3 through 5 in the sum of $2,938.00 plus interest. The trial court found against the Contractor on Counts 1, 2, and 6, as last amended, which claimed damages for breach of contract and for work and labor done. The trial court overruled the Contractor's motion for a new trial. The appeal before this court is pursuant to Rule 26 of the Revised Rules of Practice in the Supreme Court (abridgment of record by agreement rule) with the record being composed of an agreed statement of evidence and facts along with three documentary exhibits.

The review on this appeal is limited to the Contractor's claim of $35,550.94 plus interest, which is the subject of Counts 1, 2, and 6 of the complaint as amended. The parties have agreed that the basis for this claim involves only matters dealing with the construction of the sub-base course of the runway of the airport. During construction of the sub-base course, it became necessary for the Contractor to obtain materials (sand-clay, sand-clay gravel, disintegrated granite, top-soil, and bonding and blending filler) from places outside the project area to bring it up to the specifications. The amount to which the Contractor was entitled is not disputed. The only issue is whether the Contractor is entitled to recover the cost of this outside material.

The Contractor contends that the City warranted and provided in the contractual documents that the Contractor had the right to use excavated material on the project site to build the sub-base course for the runway, and that there were sufficient materials at the project site to build it according to the specifications. The Contractor asserts that such warranties and provisions were breached when the material in the project area did not comply with the specifications and it was required to obtain material from sources outside the project area.

The Contractor further asserts that its Exhibit 3, a single sheet entitled "Mechanical Analysis and Classification of Representative Examples," contained positive statements that there was sub-base material in the project area of a quality and quantity sufficient to meet the specifications for the sub-base course. This exhibit appeared to represent a mechanical analysis of soil material obtained by borings in the project area as well as a classification of representative soil samples. At the bottom of this exhibit appear handwritten figures and words which the Contractor refers to as "calculations." The Contractor further contends that these "calculations" showed that 7,123 cubic yards of material were required to build the sub-base course, and that 110,000 cubic yards of material on the project site met the specifications and were available for this purpose. The Contractor's position is that in the contractual documents, which included Exhibit 3, there were positive assertions that should be interpreted to mean "if you use the material in the project area for the sub-base course, it will meet the specifications and sufficient material is available at the project site." In addition to the alleged positive statements in the said Exhibit 3 that there was sub-base material of sufficient quantity and quality in the project area, the Contractor asserts that there were certain special provisions added to the contract which

supported its position. Such provisions are as follows:

"The Contractor may secure topsoil and subbase material from within the project limits * * *

* * * * * *

"At the direction of the Engineer, certain designated zones of the cuts, or material sources to be excavated, which afford the more suitable soils for subgrade under paved areas, shall be reserved * * *.

* * * * * *

"The Contractor may obtain this material from within the construction limits of the project. * * *"

The Contractor further asserts that the word "may" in these provisions should be construed as "shall" or "must" since this was the intention of the parties. While the normal use of the word "may" connotes a permissive character, the word can on occasion have a mandatory nature. Whether a permissive or mandatory construction is applicable depends on the apparent intention as gathered from the context, considering the whole instrument in which it is used. See 57 C.J.S. at p. 456.

The City, for one of its answers to the Contractor's position, points out that Section 20–04 of the standard specifications provided:

"The bidder is required to examine carefully the site of the proposed work, the proposal, plans, and specifications, and contract forms. He shall satisfy himself as to the character, quality, and quantities of work to be performed, materials to be furnished, and as to the requirements of these specifications, special provisions, and contract. The submission of a proposal shall be prima facie evidence that the bidder has made such an examination.

"Any information shown on the plans as to the soil or material borings or tests of existing materials is for the convenience

of the contractor. The information is not guaranteed, and no claims for extra work or damages will be considered, if it is found during construction that the actual soil or material conditions vary from those indicated by the borings."

The Contractor asserts in reply that when plans and specifications are furnished by an owner which show positively that the owner's analysis of earth borings in the project area meets the specifications, then a Contractor is not required to make investigations or tests to determine whether material meets the specifications for the construction. A number of federal cases, including United States Supreme Court decisions and decisions of the Court of Claims, are cited in support this position. United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918), is one of the cases cited by the Contractor. In that case an unforeseen hazard appeared while the work was being performed according to the plans and specifications, resulting in the Contractor's refusal to proceed further unless the government paid him to remove the hazard. The government refused to pay and cancelled the contract. The Court awarded·the Contractor the amount due for work completed plus the profit he would have earned had he completed the work. In reaching this conclusion, the Court said:

"  *   *   * Thus one who undertakes to erect a structure upon a particular site, assumes ordinarily the risk of subsidence of the soil. Simpson v. United States, 172 U.S. 372, 19 S.Ct. 222, 43 L. Ed. 482; Dermott v. Jones, 2 Wall. 1, 17 L.Ed. 762. But if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications. MacKnight Flintic Stone Co. v. Mayor, 160 N.Y. 72, 54 N.E. 661; Filbert v. Philadelphia, 181 Pa. 530, 37 A. 545; Bentley v. State, 73 Wis. 416, 41 N.W. 338. See Sundstrom v. State of New York, 213 N.Y. 68, 106 N.E. 924. This responsibility of the owner is not overcome by the usual clauses requiring builders to visit the site, to check the plans, and to inform themselves of the requirements of the work, as is shown by Christie v. United States, 237 U.S. 234, 35 S.Ct. 565, 59 L.Ed. 933; Hollerbach v. United States, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898, and United States v. Utah, etc. Stage Co., 199 U.S. 414, 424, 26 S.Ct. 69, 50 L.Ed. 251, where it was held that the contractor should be relieved, if he was misled by erroneous statements in the specifications."

Before determining whether such cases are applicable to the case at bar, this court must first determine the threshold issue of whether the Contractor has met the burden of proving the presence in the contractual documents of the alleged positive assertions that the material in the project site met the ˙specifications as to quality and quantity. It is rather clear that if Exhibit 3 does not contain the alleged positive assertions, then the Contractor has failed to meet this burden of proof. As to the alleged positive assertions appearing in Exhibit 3, the City's position is expressed in these words in its brief:

"In 'The Facts' as contained in the Appellant's [Contractor's] brief, when referred to Exhibit (3), [Contractor] states on Page 6 of his brief that 'this sheet shows an analysis of the sub-base material on which there are certain calculations made by the plaintiff which show that the required material was 7,123 cubic yards and that 110,000 cubic yards met the specifications and were available for this purpose.' This is not correct. This exhibit and these calculations were entirely unexplained by the evidence for whatever purpose. While the exhibit was that of the Plaintiff, he submitted no explanation to the court of the exhibit or of the so-called, calculations there on [sic], when they were placed there on [sic] or by whom.

"The contract gives the specifications for the sub-base in Section 213–2.1

**78**

which was copied for the convenience of the court and is found in the Transcript pages 22 and 23. The materials for the sub-base are described in that entire section. It is absolutely impossible for any person to read Exhibit (3), the analysis (Tr. p. 24) and tell whether or not there were materials present to meet such specifications. A ready example of such impossibility would be the percentages which pass certain screen sizes. The contract requires 85–100% to pass a 1″ screen and other percentages to pass a No. 4 screen. The analysis sheet commences with a No. 10 screen (Tr. pgs 22 & 24). The 1″ screen and No. 4 screen were not tested. Obviously, the statement of the Appellant that the unexplained figures on the exhibit show that there were ample materials present on the site is in error. Also, the specifications show that 'the material passing the number 40 mesh sieve shall have a plasticity index not to exceed 6. . . .' (Tr. p. 22). Fifteen of the twenty-seven boring[s] exceed six (Tr. p. 24). How could any court without some evidence know whether or not there was material present that did nor did not meet the specifications. The burden was on the Appellant to sustain his claim. This is the whole basis of the suit.

"In addition, there is no evidence that the figures which are in writing on this exhibit of the Plaintiff refer to sub-base or to this claim of the Plaintiff. They are meaningless figures. The Plaintiff made no effort to explain them to the lower court by any evidence."

The trial court in its opinion and judgment recited the following provision in the contract:

"The Contractor may obtain this material from within the construction limits of the project. It shall be excavated and stockpiled in areas designated by the engineer until it can be placed in permanent position. *If the contractor elects to use this material it shall in no way ex-* *empt him from complying with the specifications in this section."* (Emphasis added.)

 The trial court found that such provision in the contract was perfectly clear, and that the Contractor was in nowise misled by the plans and specifications submitted by the City, and that the City was not liable to the Contractor. The record and the briefs and arguments of the Contractor have not convinced this court that the word "may" should be construed in a mandatory sense, or that "positive assertions" as to the quality or quantity of the material appeared in or on Exhibit 3, or that the trial court erred. Therefore, this case is due to be

Affirmed.

MERRILL, BLOODWORTH, MADDOX and FAULKNER, JJ., concur.