RLS ASSOCIATES, LLC.,
Plaintiff–Appellant,

v.

UNITED BANK OF KUWAIT PLC.,
Defendant–Appellee.

No. 03–9112.

United States Court of Appeals,
Second Circuit.

Argued: May 14, 2004.

Decided: Aug. 19, 2004.

Michael H. Smith, Todtman Nachamie Spizz & Johns, P.C., New York, NY, for Plaintiff–Appellant.

Loren F. Selznick, Dailey & Selznick, New York, NY, for Defendant–Appellee.

Before: LEVAL and KATZMANN, Circuit Judges, and MURTHA, District Judge.*

LEVAL, Circuit Judge.

Plaintiff RLS Associates, LLC ("RLS") appeals from a grant of summary judgment in favor of the defendant United Bank of Kuwait, PLC ("UBK"). RLS brought suit before the United States District Court for the Southern District of New York (Charles S. Haight, *J.*) seeking damages by reason of UBK's breach of an amendment to a contract between them made in the United Kingdom. Under the amendment, UBK undertook to pay fees to RLS at the previously contracted rate for a year following UBK's exercise of its right to terminate the contract. UBK terminated the contract but refused to make the additional year's payments. Both sides moved for summary judgment.

---

* The Honorable J. Garvan Murtha, United States District Judge for the District of Vermont, sitting by designation.

UBK's motion was premised on the grounds that the amendment was not supported by valid consideration, as required by English law. The district court agreed with UBK and granted summary judgment. We believe the amendment was supported by legally sufficient consideration. Accordingly we vacate the judgment and remand for further proceedings.

## Background

In 1994, UBK, under the direction of Duncan Smith, the head of its Islamic Investment Banking Unit, established the IIBU Fund II PLC (the "Fund") for the purpose of generating income in a manner compatible with Islamic prohibitions on interest—by sale and lease transactions. [Red 4] Beginning in 1995, UBK gave a variety of work relating to the management of the Fund to Richard L. Swomley, a consultant who had previously assisted in the formation of the fund and consulted on leasing investments while employed by an investment bank. Swomley formed RLS to perform the work in question.

Between January and June of 1996, UBK and RLS executed three Consultancy Agreements (the "Consultancy Agreements"), in approximately identical terms, each involving a different third party as an Asset Manager to the Fund. [A 645-69] The Asset Managers would present leasing opportunities to the Fund and administer the approved leases, collecting rent and paying commissions and expenses. [A 775-76] The Asset Managers were to earn a percentage of the rental income generated and to remit the remainder to the Fund. [A 775-76]

Each Consultancy Agreement set forth RLS's obligations to UBK to provide a variety of "general consulting and advisory services," including research, analysis, and reporting on the leasing markets and non-leasing opportunities in the United States, as well as monitoring the quality and performance of the Fund's assets. [A 646] In Paragraph 2, the agreements also detailed a system for payments, under which the Asset Manager would transfer a percentage of the gross rental revenues and excess reserves to a designated account (the "LIC account") under the control of UBK, from which UBK would pay the sums due RLS. The Consultancy Agreements, as supplemented by side letters, provided the rate of compensation RLS was to receive for its services. [A 646-47]

The Consultancy Agreements provided that they could be terminated by either UBK or RLS at any time by written notice, and upon payment of any fees due up to the date of termination. [A 657] With the exception of the confidentiality and noncompetition clauses, which were to remain in effect after termination, the Consultancy Agreements imposed no further post-termination obligation on either UBK or RLS. UBK was free to terminate at any time without obligation to pay fees for any future period, and RLS had no obligation to perform services for UBK following its receipt of a termination notice from UBK. The Agreements provided that they would be interpreted in accordance with English law. [A 668]

In a document dated November 3, 1997, RLS and UBK entered into a new agreement to amend the terms of the Consultancy Agreements (the "November Amendment"). The gist of the November Amendment was to provide that, in the event UBK terminated the Consultancy Agreement, RLS would continue to receive commissions for one year, provided that RLS "will continue to" perform duties reasonably requested by UBK and "may if requested by UBK provide reasonable assistance in identifying a replacement" for itself. The text of this provision is set forth in the margin.[1]

---

1. RLS will receive commissions as set out in Paragraph 2 of the [Consultancy Agreements]

The November Amendment in addition contained provisions purporting to recite consideration furnished by RLS to UBK for UBK's promise of an additional year of fees. It stated,

Our agreement to vary the termination arrangements of the Agreements is given in consideration of the following:

1. That RLS was instrumental in establishing productive relationships between [the Fund], Cantrip Investments Limited ... and each of [the three Asset Managers].

2. That RLS has undertaken to perform other and/or similar duties in connection with the U.S. leasing industry, with other UBK-sponsored collective investment schemes which may or may not involve [the three Asset Mangers] from which RLS derives directly or indirectly no financial benefit and other non-leasing related matters for the benefit of UBK. For the avoidance of doubt other duties on behalf of UBK for which RLS is compensated are dealt with and documented separately.

[A 706] The November Amendment also provided that if RLS or Swomley engaged in activities which UBK reasonably deemed prejudicial to its interests, then UBK would "have the right to stop immediately the payment of any and all commissions as referenced in the [Consultancy] Agreements." [A 707]

In late 1999, it appears that relations between UBK and RLS soured. Duncan Smith was dismissed from UBK in November 1999 on apparently hostile terms, and Swomley resigned from the Fund's Board on February 8, 2000. On February 14, UBK notified RLS and the Asset Managers that it was terminating the Consultan-

cy Agreements, and advised the Asset Managers to send all commissions that would have been paid to the LIC account to the Fund instead. Swomley wrote to UBK demanding continued commissions for one year after, as per the November Amendment. When UBK refused this request, RLS filed the present action to recover a year's post-termination fees, as provided for in the November Amendment.

Following discovery, both sides moved for summary judgment. The district court granted defendant's motion, reasoning that the November Amendment's provision granting post-termination compensation to RLS was invalid for lack of consideration. *RLS Assocs., LLC v. United Bank of Kuwait PLC*, 2003 WL 22251332, at *8 (S.D.N.Y., Sept.30, 2003). The court first addressed the two paragraphs, quoted above, which purport to recite consideration. As to the first, specifying RLS's work in establishing productive relationships for the Fund, the court found that it did not constitute valid consideration under English law because this consideration had already been rendered prior to the November Amendment, and under English law consideration previously rendered does not satisfy the consideration requirement. *Id.* at *5 (citing *In re McArdle*, [1951] Ch. 669, 678 (Eng.C.A.) (promise in exchange for past performance is not supported by consideration)). The second recitation of consideration, specifying RLS's agreement to undertake "other and/or similar duties in connection with the U.S. leasing industry," did not, in the court's view, describe any duties not already encompassed within RLS's obligation under the Consultancy Agreements to provide "general consulting

and amended by the letter agreement between UBK and RLS ... for a period of one year from the date of UBK's notice of termination to RLS, provided that RLS will continue to perform such duties as [UBK] may request

reasonably within the terms of Paragraph 1 of each [Consultancy] Agreement and may if requested by UBK provide reasonable assistance in identifying a replacement for RLS. [A 707]

and advisory services" on leasing markets in the United States. *Id.*

The court then addressed the two-part proviso of the clause granting RLS the additional year of commissions. As for the first proviso—that "RLS will continue to perform such duties as [UBK] may request reasonably within the terms of Paragraph 1 of each [Consultancy] Agreement"—the court concluded that it provided nothing of value to UBK, because in the court's view, under the preexisting agreement, UBK could have exacted these services from RLS merely by delaying for a year its notice of termination. *Id.* at \*6.

As for the second part of the clause— "provided that RLS ... may if requested by UBK provide reasonable assistance in identifying a replacement for RLS"—the court found that the use of the word "may" left in RLS's discretion whether it would provide such assistance. The court thus found this to be "illusory" consideration because its terms "left performance entirely to the discretion of the promisor." *Id.* (quoting *Chitty on Contracts* § 3–024 (H.G. Beale ed., 28th ed. 1999) ("*Chitty* ") and citing *Beswick v. Beswick,* [1968] App. Cas. 58, 96–97 (1967) **[E 495]** ).

The court concluded that RLS's proffered theories of consideration did not "amount to even a 'peppercorn' of consideration." *Id.* at \*5 (quoting *Chitty* § 3–017). It therefore found the November Amendment invalid, and granted UBK's motion for summary judgment, dismissing RLS's claim for a year of commissions following UBK's notice of termination.

## Discussion

■ English law requires that consideration—"something of value in the eye of the law"—be given in exchange for a promise in order to make the promise an enforceable contract. *Chitty* § 3–002 (citing *Thomas v. Thomas,* [1842] 2 Q.B. 851, 859). The same requirement applies in the case of an amendment to a contract. *Harrods, Ltd. v. Geneen,* [1938] 4 All E.R. 493, 499 (Eng.C.A.) **[E 148]** ("The variation of a contract, like the creation of an original contract, must be supported by some consideration to make the party bound to that variation."). Either a benefit to the promisor or a detriment to the promisee can provide consideration. *Chitty* §§ 3–004, 3–005; *Currie v. Misa,* [1875] 10 L.R.-Ex. 153, 162 **[E 375]**. So long as a contract provides some consideration, it may be minimal—even a peppercorn. *Chitty* § 3–017. Courts do not inquire into the value or adequacy of the consideration. *Wild v. Tucker* [1914] 3 K.B. 36, 39 **[E391]**.

We review the district court's grant of summary judgment *de novo,* examining all evidence in the light most favorable to and drawing all inferences in favor of the non-moving party. *North River Ins. Co. v. Ace Am. Reins. Co.,* 361 F.3d 134, 139 (2d Cir.2004).

■ We respectfully disagree with the district court's conclusion that the November Amendment included no valid consideration for UBK's promise of a year of post-termination pay. In our view, the November Amendment in fact imposed a new obligation on RLS, which satisfies the requirement of consideration. Whereas, under the original Consultancy Agreements, RLS was free to terminate its services at any time without forfeiting its right to receive previously earned fees, under the November Amendment, in order to earn the right to the additional year of fees following UBK's notice of termination, RLS was obligated during the full year to render reasonable assistance to UBK (if requested) in finding a replacement for itself. This obligation was sufficient to satisfy the law's requirement.

## I. *Consideration*

■ Focusing exclusively on the selection of the word "may," the district

court read this clause to impose no obligation on RLS, but rather to leave within RLS's discretion whether it would render assistance. Because a promise that leaves in the discretion of the promisor whether to perform would not constitute valid consideration under English law, *Chitty* § 3–024; *Beswick*, [1968] App. Cas. at 96–97, the district court found that this undertaking did not satisfy the consideration requirement, 2003 WL 22251332, at *6.

■ We believe the court attached excessive significance to the customary meaning of "may" in legal jargon, without adequately considering the overall structure and context of the sentence in which the word was used. Although the word "may" is generally permissive, it can also be read as mandatory where the context suggests the parties so intended. *See Med. Def. Union Ltd. v. Dep't of Trade*, [1979] 1 Lloyd's Rep. 499, 503 (Ch.1978) (treating interpretation of "may" as "prima facie permissive and not imperative" and interpreting clause as permissive where "nothing in the nature of the subject-matter" suggested reading the term as mandatory); *see also Burgess Mining & Constr. Corp. v. City of Bessemer*, 294 Ala. 74, 312 So.2d 24, 26 (1975) ("While the normal use of the word 'may' connotes a permissive character, the word can on occasion have a mandatory nature. Whether a permissive or mandatory construction is applicable depends on the apparent intention as gathered from the context, considering the whole instrument in which it is used."); *Carleno Coal Sales, Inc. v. Ramsay Coal Co.*, 129 Colo. 393, 270 P.2d 755, 757 (1954) (reading "may" as mandatory where reading it as permissive "would be to give no meaning whatever to an entire paragraph of the contract, and to interpret it as mere surplusage").[2]

■ The preparation of contracts is not reserved to lawyers and persons trained in the norm of legal usage. To understand the intended meaning of a contractual provision and particularly to appreciate whether it was intended to create a mandatory obligation, as opposed to a discretionary option, a court must read the relevant terms of a provision in full and in context, rather than simply assume that the selection of a particular word was intended to denote the significance lawyers normally intend by its use. *See Burgess*, 312 So.2d at 26. A court's primary task in interpreting a contract is to determine intentions of the parties, *Chitty* § 12–042 (citing *Marquis of Cholmondeley v. Clinton*, (1820) 2 Jac. & W. 1, 91), as objectively manifested by the language of the contract in light of the background against which the contract was written. *Mannai Inv. Co. v Eagle Star Life Assurance Co.*, [1997] A.C. 749, 775. While giving the words used in a contract their most common meaning generally serves this goal, courts should not adhere unyieldingly to a close technical reading that is at odds with the most reasonable interpretation of con-

---

2. *See also Mullan v. Anderson*, 1993 S.L.T. 835, 840 (observing that "statutory permissive language can sometimes be read as imperative, but ... the burden ... is on the person seeking to have an obligation implied from words which are permissive and enabling" (internal quotation marks omitted)); *Patmor Ltd. v. Edinburgh Dist. Licensing Bd.*, 1987 S.L.T. 492, 494 (in interpreting statute, noting, "[P]rima facie the word 'may' empowers rather than enjoins but it is well settled that in an appropriate context it may be construed as imperative."). For another American court treating "may" as mandatory, see *TM Delmarva Power, L.L.C. v. NCP of Virginia, L.L.C.*, 263 Va. 116, 557 S.E.2d 199, 201 (2002) ("[W]hile the word 'shall' is primarily mandatory in effect, and 'may' is primarily permissive in effect, courts, in endeavoring to arrive at the meaning of written language ... will construe 'may' and 'shall' as permissive or mandatory in accordance with the subject matter and context." (internal quotation marks omitted)).

tract's terms. *See id.* at 771, 312 So.2d 24 (in construing commercial contract, "[w]ords are ... interpreted in the way in which a reasonable commercial person would construe them, and the standard of the reasonable commercial person is hostile to technical interpretations and undue emphasis on niceties of language.").

In our view, notwithstanding its use of the word "may," the more likely and natural meaning of the pertinent clause when read in full and in context was that, in order to earn the right to an extra year's commissions, RLS was obligated, if requested, to render reasonable assistance in the identification of a replacement for itself.

The pertinent part of the sentence states that

> RLS will receive commissions ... for a period of one year from the date of UBK's notice of termination ... provided that RLS ... may if requested by UBK provide reasonable assistance in identifying a replacement for RLS.

Admittedly, the clause is somewhat unclear. It could have either of two meanings: (i) RLS will be entitled to commissions for a year following UBK's notice of termination provided that, if asked by UBK to provide assistance in identifying a replacement, it reasonably complies; or, (ii) RLS will be entitled to commissions for a year following UBK's notice of termination provided that, if asked by UBK to provide assistance in identifying a replacement, RLS does whatever it chooses—either granting or refusing assistance.

In our view, it is highly unlikely that the latter interpretation represented the intention of the parties. The use of the words "provided that" strongly implies that RLS's entitlement to an additional year's commissions was not unqualified, but depended on its reasonable compliance with UBK's request. Had the other understanding been intended, the parties would

be expected to have used very different words to express it—something like, "RLS's entitlement to the additional year of commissions shall not depend on whether it complies with any request by UBK for assistance in identifying a successor." Furthermore, the use of the word "reasonable" as qualifying the amount or nature of assistance due (in the clause, "may ... provide reasonable assistance") would make no sense at all if the overall purpose of this clause were to provide that RLS was under no obligation to render any assistance whatsoever as a condition on its right to the extra year's commissions.

All in all, considering this sentence exactly as written by the parties (including their use of the word "may"), it seems to us far more likely to have been intended to impose an obligation of performance on RLS than to impose no obligation at all, but merely to describe gratuitously actions RLS was free to take or not take at its whim without consequence.

██ Our interpretation is further supported by the sworn declaration of Duncan Smith, a former officer of UBK who, on its behalf, directed the drafting of the November Amendment and signed it for UBK. [A 791, 1094] Smith's declaration asserted that the language in question was intended to be mandatory and to create an obligation on the part of RLS "to assist in finding a replacement if requested by the Bank." [A 1100, 1096] Although parol testimony " 'cannot be received to contradict, vary, add to or subtract from the terms of a written contract,' " *Chitty* § 12–094 (quoting *Bank of Australasia v. Palmer,* [1897] A.C. 540, 545), it may be received to assist in interpreting the language in cases of ambiguity, *In re Goods of De Rosaz,* [1876–77] 2 P.D. 66, 69 (1877); *Chitty* §§ 12–115, 12–123. UBK proffered no evidence contradicting Smith's declaration as to the meaning of this clause.

Finally, this ambiguous agreement was drafted by UBK. [A 706–07, 791, 1094] Ambiguities are generally interpreted against the drafter. Although this rule of construction applies only as "a rule of, if not last, very late resort," *Lakeport Navigation Co. Pan. S.A. v. Anonima Petroli Italiana, S.P.A.*, [1982] 2 Lloyd's Rep. 205, 208 (C.A.); *Chitty* § 12–081, application of the principle supports our view and militates against a construction that would allow UBK to escape its clearly stated obligation to pay a year's commissions by reason of ambiguity in other provisions it drafted.

We find that the November Amendment required RLS to render reasonable assistance in finding a replacement consultant, if requested by UBK. This obligation alone satisfies the consideration requirement.[3]

II. *UBK's Contentions*

UBK offers alternate grounds on which it argues we should affirm the district court's grant of summary judgment, both of which were presented to and rejected by the district court. *See Mass. Mut. Life Ins. Co. v. Ludwig*, 426 U.S. 479, 481, 96 S.Ct. 2158, 48 L.Ed.2d 784 (1976) (" '[T]he appellee may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it.' ") (quoting *United States v. Am. Ry. Express Co.*, 265 U.S. 425, 435, 44 S.Ct. 560, 68 L.Ed. 1087 (1924)).

UBK first argues that the November Amendment is invalid under the terms of the original Consultancy Agreements because it was not signed by the Asset Managers. Paragraph 13 of the Consultancy Agreements states that "no modification or amendment or provision of this Agreement shall be effective unless the same shall be reduced to writing and signed by the parties." [A 659] Although an Asset Manager signed each Consultancy Agreement along with RLS and UBK, the "whereas" clause in Paragraph E states that the Asset Manager "execut[ed] this Agreement for the sole purpose of evidencing its agreement to pay the amounts and at the times contemplated by Clause 2 hereof [detailing commission payments]." [A 655] Reading Paragraph 13 in light of Paragraph E, the district court found ambiguity as to whether the signature of the Asset Managers would be required for modification that did not affect the Asset Manager's obligations. The court thus denied UBK's motion for summary judgment insofar as based on that ground.

We agree with the district court. In addition to Paragraph E's limitation on the Asset Managers' role, we note that other passages appear to contemplate treating only RLS and UBK as parties with rights under the contract. For example, the paragraph governing termination allows that the agreement may be terminated by either UBK or RLS at any time, but makes no provision for termination by the Asset Manager. [A 648] The contract also addresses waiver of any breach "by either

---

3. Because we conclude that the November Amendment obligated RLS to render reasonable assistance in the identification of a replacement for itself and that this obligation satisfied the requirement of consideration, we have no need to pass on whether other provisions of the November Amendment also imposed obligations on RLS, which would quali- fy as consideration under English law, or whether, in view of the fact that the pre- existing agreement between RLS and UBK was terminable by either side at will, the November Amendment amounted to a mutual agreement to terminate the prior agreement and re-adopt most of its terms in a new, modified agreement.

party," implying that only two entities are parties with rights under the contract. [A 651] We conclude that the district court correctly denied UBK's motion for summary judgment on this ground.

 Finally, UBK argues that RLS's interpretation of the November Amendment would impermissibly impose obligations on the Asset Managers without their assent because it would require the Asset Managers to provide an extra year of commissions. This would be so, according to UBK's argument, because the Asset Managers are the source of the funds used to pay RLS. Like the district court, we reject the argument. *Id.* at *5-6. The Asset Managers were contractually obligated to make the payments in question to UBK. Accordingly, these payments became the property of UBK, and the November Amendment did not impose obligations on the Asset Managers to which they had not consented. We see no merit in this argument.

## Conclusion

The judgment of the district court is VACATED and the matter REMANDED for further proceedings.