NORTHERN PAC. RY. CO. v. GOSS et al.

GOSS & SLEEGER v. NORTHERN PAC. RY. CO.

(Circuit Court of Appeals, Eighth Circuit. February 22, 1913.)

Nos. 3,790, 3,792.

1. INTEREST (§ 50*)—BUILDING CONTRACT—ACTION FOR CONTRACT PRICE—CONDITIONAL TENDER.

Plaintiffs contracted to build certain buildings for defendant railroad company, the contract providing that on final payment they should execute "a valid discharge from all claims and demands growing out of, or connected with this contract." On completion of the work, the amount due therefor was not in dispute, and defendant tendered payment, provided plaintiffs would sign a receipt releasing it from all claims "of every kind and description * * * arising out of, or connected with, said contract or its obligations." At that time certain damage claims

for injuries to employés and otherwise growing out of the collapse of, one of the buildings while under construction were pending and unadjusted. *Held*, that plaintiffs were justified under the circumstances in refusing to execute a receipt so sweeping in its terms, and on recovery under the contract were entitled to interest from the date when the payment was due under its terms.

[Ed. Note.—For other cases, see Interest, Cent. Dig. § 114; Dec. Dig. § 50.*]

2. CONTRACTS (§ 302*)—BUILDING CONTRACTS—RIGHTS AND LIABILITIES OF PARTIES—DEFECTIVE PLANS.

While an owner who, though his architect or engineer, makes plans and specifications for a building, to be followed by a contractor, is liable to the latter for damages resulting to him from serious defects in such plans, which are not patent to an ordinary mechanic, nor discoverable by ordinary diligence, it is also the duty of the contractor to examine the plans and judge of their efficiency, and he may be bound by his contract even if they are defective, especially if the defects are patent or reasonably discoverable, and he examines the plans before he enters into the contract.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1401–1408; Dec. Dig. § 302.*]

3. CONTRACTS (§ 353*)—BUILDING CONTRACT—ACTION FOR BREACH—ISSUES AND PROOF.

Plaintiffs, who were experienced builders, contracted to build two icehouses for defendant in accordance with plans and specifications made by defendant's engineer. The structures were very simple, consisting of four hollow sides which were to be held together, above the bottom, only by the roof trusses. In constructing the walls plaintiffs secured them in position by braces fastened to stakes on the inside. When the first building was inclosed, they made the roof trusses inside of it, raising them from there into position, commencing at one end of the building. As this work progressed the braces holding the walls, which were in the way, were removed, and not replaced. When about two-thirds of the trusses had been raised, the building collapsed in a moderate wind, and plaintiffs were put to expense in paying damages to injured workmen, and for reconstruction, to recover which they brought an action against defendant, alleging that the collapse was due to the insufficiency of the plans and specifications. There was a conflict of testimony as to whether the building would have been sufficiently stable when completed, but the evidence showed that it would have been much more so than when it collapsed, and tended to show that it would not have collapsed if the braces had been kept in place. *Held*, that the question was not as to the stability of the building when completed, but whether it could have been safely completed in accordance with the contract by the use, by plaintiffs, of known and ordinary methods of construction.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 93, 1829–1844; Dec. Dig. § 353.*]

4. JUDGMENT (§ 708*)—JUDICIAL RECORDS—COMPETENCY AND RELEVANCY.

In such action, neither the judgment recovered, nor the evidence introduced, in a prior action against the contractors for the death of an employé killed when the building collapsed, based on the alleged negligence of the contractors in removing the braces, was competent evidence against the owner.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1230; Dec. Dig. § 708.*]

In Error to the District Court of the United States for the District of Minnesota; Charles A. Willard, Judge.

Action at law by M. N. Goss and A. K. Sleeger, copartners as

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Goss & Sleeger, against the Northern Pacific Railway Company. From the judgment both parties bring error. Reversed in part.

Goss & Sleeger, plaintiffs below, were a firm of contractors and builders of St. Paul, Minn. Sleeger, the more practical member of the firm, had been engaged in this business for a period of 11 or 12 years as superintendent and inspector of construction for others, and as a builder and contractor both independently and as a member of the plaintiff firm. In 1908 defendant below, a railway corporation, through a subsidiary company, was constructing 35 houses at Laurel, Mont., the contract for which was let to the plaintiffs. While the latter were engaged upon this work they learned that the railway company was about to construct two icehouses and a yard office at the same place. At their desire, plans and specifications were submitted to them, and they were awarded the contract over other competitive bidders. The contract price for the buildings and their appurtenances was $6,585. Each icehouse was to be 216 feet long, 36 feet wide, and 26 feet high to the top of the plate; trusses to support the boards of the roof were to be placed four feet apart for the entire, length of the building, the bottom chord of the truss to be nailed securely to the top plate; the studding for the sides was to be 2 inches by 12 inches; the outside wall was to be covered with 1-inch by 6-inch drop siding, and the inside walls were to be sheathed with 1-inch by 10-inch boards. Thus, as will be seen, the building when completed was to be a box like structure of very simple character, consisting of four walls with a roof covering binding the whole together. In erecting the walls it was found necessary to use braces to hold them in position as the work progressed. These braces consisted of boards 2 inches by 8 inches in dimension, nailed to the studding of the wall on the inside about 3 feet from the top, and extending diagonally downward toward the center of the building, where they were nailed to stakes. As the sheathing was put on, by which the walls were made heavier, it was found necessary to strengthen each brace by the addition of a second plank or board nailed to the side wall near the ground, and extending diagonally toward the center of the building. Neither this nor any other system of bracing was prescribed by the plans and specifications. It was adopted as a usual and ordinary method of safeguarding work in progress of construction until such time as the permanent features of the structure should furnish the necessary or contemplated stability.

The contract was made September 23, 1908, and by the 28th of November following the four walls of the first icehouse had been completed with the exception of 10 feet square of drop siding on the north side and 33 of the 54 roof trusses had been placed. These trusses were connected and in some degree supported by temporary strips or boards nailed across them; but the roof boards, which would add homogeneity to the entire roof, had not been nailed on. The plans contemplated a plank walk 3 feet wide to be constructed directly under the ridge of the roof on the bottom chord; this walk had not yet been constructed. Also it was provided that rods of 1-inch wrought iron should bind the foundation sills together at the corners; these supporting rods had not yet been placed. The walls having been erected, and being supported in position by the braces heretofore described, plaintiffs began the work of putting on the trusses—starting at the west end of the building. The trusses were built on the ground inside of the building, and each truss, weighing 900 pounds, was hoisted to its position at the top of the building by means of a gin pole. While constructing these trusses, or at least before raising them to the top of the walls, plaintiffs removed the bracing heretofore described, and the braces thus removed were not replaced. If the trusses had been constructed and raised to position outside the building, the removal of these braces would have been unnecessary; but to construct and raise within the building was deemed more convenient and economical. The braces, crossing each other and anchored on the ground at a point midway between the walls, obstructed the building and raising of the trusses by the method adopted by the contractors. Consequently it was deemed necessary to remove such braces—from west to east—as the trusses were built and raised. It will thus be seen that when 33 trusses, counting from the west end, had been raised and set in place, all that portion of the walls immediately under

them, or approximately ⅗ of the length of the building, was without bracing, except that afforded by the trusses themselves, and the temporary boards nailed upon them. It would have been both possible and practicable to have restored these braces after each truss had been raised to position, or other means of bracing could have been employed. Neither method was adopted by the contractors. On this 28th day of November, the wind was blowing at the rate of 12 to 15 miles an hour from the southwest. The building suddenly showed signs of collapsing, and before steps could be taken to prevent this the entire structure fell toward the north and east. One workman, named Johnson, was killed outright, several others were injured, and a large amount of material was wrecked and destroyed.

The plaintiffs then requested of the defendant that for the reconstruction of this icehouse, and the building of the second house, additional braces, known as knee-braces, and a bulkhead or cross-partition, should be added as parts of the permanent structure. To this the defendant acceded. Plaintiffs then completed their contract, and the buildings were turned over and accepted. At the completion of the contract there was due plaintiffs on the contract price and for extra work $2,220.84. This claim accrued March 30, 1909, and defendant tendered payment, provided plaintiffs would sign a receipt declaring "every claim of every kind and description arising from said contract in our favor and against said Northern Pacific Railway Company, its successors and assigns, arising out of or connected with said contract, or its obligations, fully paid, satisfied and discharged." This plaintiffs refused to do.

On or about April 1, 1909, the administrator of the estate of Joseph E. Johnson, plaintiffs' employé who was killed by the collapse of the building, brought suit against Goss & Sleeger in the district court of Ramsey county, Minn., to recover damages for the death, alleging gross negligence and carelessness on the part of Goss & Sleeger in removing the braces hereinbefore referred to; that the removal of these braces rendered the building unsafe, and was the direct cause of the accident. This was denied by Goss & Sleeger, who charged in their answer that deceased came to his death by reason of his own carelessness and negligence. The jury returned a verdict for the plaintiff in the sum of $4,000, and judgment for this, together with interest and costs, was entered in the sum of $4,121.03. Goss & Sleeger paid this judgment, and incurred additional expenses, in the defense of said action, in the sum of $1,194.20. Before trial they notified the Northern Pacific Railway Company to appear and defend the action; to which the Railway Company, disclaiming responsibility for the negligence charged, did not respond.

It is admitted that after the accident the plaintiffs below paid on account of injuries to the other workmen the sum of $457 in full settlement thereof.

It further appears, practically without dispute, that plaintiffs' actual outlay for labor, services, and material necessary to the reconstruction of the collapsed building to the stage of completion at the time of collapse was $967.81.

April 19, 1910, Goss & Sleeger brought suit against the railway company upon four causes of action: The first, to recover the sum of $5,315.23, on account of the judgment and other expenses which they had been compelled to pay because of the death of the workman Johnson; the second, for the recovery of $457, with interest, paid in settlement of claims of other injured workmen; the third, for the recovery (as finally asserted) of $967.81, with interest, for their outlay in the reconstruction of the collapsed building; the fourth, for the recovery of the balance due on contract price and for extra work, with interest from the date it was due and payable. The first three causes of action are founded upon the contention that the damages laid therein were wholly due to the defects and insufficiency of the plans and specifications tendered by the railway company, and that the latter is liable upon the implied warranty that such plans and specifications were in all respects safe, adequate, and sufficient for the purposes designed.

In support of the first cause of action counsel for complainants offered the record of the evidence taken in the case of Johnson's administrator against Goss & Sleeger. This was excluded. Plaintiffs next sought to prove by two witnesses that Johnson left a family surviving him, and of what it consisted.

Neither witness proved competent to testify. The court directed the jury to find for the defendant upon this cause of action.

The second and third causes of action were submitted to the jury. As bearing upon the issues joined therein experts introduced by plaintiffs testified, in substance, that the plans used were inadequate for buildings of sufficient stability to withstand such strains from wind, or otherwise, as might reasonably be anticipated. Other experts, produced on behalf of the defendant, testified directly to the contrary. All were of opinion, however, that the contractors could have brought the building to completion by the use of such bracing, as they did in fact employ, before the trusses were raised, and that the building would have been stiffer when finished in all details, as specified, than it was when the collapse took place. Upon these points Mr. Sleeger, one of the plaintiffs, testified: "Q. Do you say that it would have been impossible to complete that structure in accordance with the plans and specifications, and to have turned it over to the railway company, regardless of how long it would stand? A. I don't say it was impossible. Q. Do you think it would have been possible? A. A man could have done that. Q. Don't you think that if the bracing which you had put in temporarily, the temporary bracing, had not been taken out, but had been left in place until you got the rafters on, that the wall would not have collapsed? A. It wouldn't at that time, as long as the braces were in there the building would have stood. Q. The building would have stood? A. Yes, sir. Q. That is, the walls would not have collapsed? A. No, sir. * * * Q. Would the presence of that three-foot walk have a stiffening effect upon the trusses, and have a tendency to stiffen the top of the building? A. It might tend to stiffen it a little. Everything would help some. * * * Q. Of course, with the four walls put in place there is no stiffening on the top, and there is a tendency to collapse. It would be like four cards set against each other with nothing on the top of them to form a square? A. Yes, sir. Q. It is the top that finally gives solidity to the whole thing? A. Yes, sir; the top which set on top of the plate, that is what holds your building in position."

Concerning the extent of supervision exercised by defendant he testified as follows: "Q. You don't mean to give the impression, Mr. Sleeger, that you were controlled as to how you did the work, in any sense, by Mr. Blum or by Mr. Rigney (defendant's employés)? A. No. Q. You were to construct and put up the building in any way that you saw fit, providing you followed these plans and specifications? A. Yes, sir; I was supposed to follow the plans and specifications, which I presume I did. Q. You were a perfectly free agent as to how you would go ahead and do the work, what you would do first and what you would do second? A. Yes, sir."

On the fourth cause of action a verdict was directed for plaintiffs in the sum of $2,220.84, with interest from the same date. The jury returned a verdict for plaintiffs upon the second, third, and fourth causes of action in a sum aggregating $4,233.81, and judgment was entered accordingly. Each party being dissatisfied with the judgment has sued out a writ of error; the defendant complaining of any recovery whatsoever under the second and third causes of action, and of the allowance of interest from March 30, 1909, on the fourth cause of action; the plaintiffs assigning as error the action of the court in directing a verdict for defendant upon the first cause of action.

Charles Donnelly, of St. Paul, Minn. (Charles W. Bunn, of St. Paul, Minn., on the brief), for Northern Pac. Ry. Co.

James D. Shearer, of Minneapolis, Minn. (L. B. Byard, of Minneapolis, Minn., and Arthur J. Stobbart, of St. Paul, Minn., on the brief), for Goss & Sleeger.

Before HOOK and SMITH, Circuit Judges, and VAN VALKENBURGH, District Judge.

VAN VALKENBURGH, District Judge (after stating the facts as above). For convenience the several causes of action will be taken up in their inverse order:

[1] 1. It is agreed that upon the completion of the work defendant owed the plaintiffs a balance of $2,220.84 on contract price and for extra work. This was due and payable March 30, 1909; therefore, legal interest should run from that date, unless circumstances intervened which justified the railway company in withholding payment. The defendant coupled its tender with insistence upon a receipt releasing defendant from all claims of every kind and description arising out of or connected with the contract or its obligations. It based this demand upon the following provision of the contract:

"When in the opinion of the chief engineer this contract shall have been performed, he shall so certify in writing and give a final estimate and a statement of the balance unpaid; and the company will within thirty days thereafter pay the full amount so found unpaid. The contractor will at final payment execute, acknowledge and deliver to the company under his hand and seal a valid discharge from all claims and demands growing out of or connected with this contract."

The contract had been performed, and the engineer made the required certificate February 28th. While the language of the receipt conforms to the contract requirement, nevertheless the claims for damages, arising out of the collapse of the building, were then pending and unadjusted. In view of that situation, plaintiffs might well have declined to sign a receipt so sweeping in its terms. We agree with the court below that these claims, although in a sense arising out of the contract, were not connected with the performance of the work, and were not intended to be covered by the clause requiring a release as a condition to payment of the final estimate. For this reason interest from March 30, 1909, was properly allowed.

2. The second and third causes of action present the same questions, and will be considered together. The liability of an owner for damages incidental to the erection of buildings upon his property varies according to the circumstances of the case and the relationship of the parties. This has led to confusion and apparent conflict in the decided cases. The English rule, as stated by Mr. Hudson in his late work on Building Contracts, is that the contractor has no remedy against either architect or employer if the plans and specifications turn out to be unworkable, unless he has obtained some express warranty as to their nature and quality. Both parties must make their own calculations, and if one does not inquire into the matter, or runs the risks, he must take the consequences. While this statement is probably too broad to be accepted as the rule in the courts of this country, it must be said to embody the basic principle involved, and departures must be in the nature of exceptions arising under special circumstances; otherwise great instability and confusion would be introduced into all building transactions, great or small, public or private, and the doctrine thus announced would be constantly invoked to repair losses due to incompetency and improvidence. Certain it is that the contractor must be held to the exercise of reasonable care and the employment of reasonably essential and recognized methods of work. He must make such examination and assume such risks as the general nature of the work and the situation of the parties impose upon him. The law does not raise in his favor such

an implied warranty as will excuse the contractor from all practical responsibility.

[2] In this connection it will not be unprofitable to restate the general principles to be deduced from a careful examination of the American decisions. An owner through his architect or engineer cannot erect upon his own property a structure so frail as to be a menace to life and limb of the public, and hence a nuisance, and avoid responsibility upon the ground of having taken counsel of those supposed to be skilled in that field of knowledge. This rule, though harsh, is sustained by reasons of public policy. Wilkinson v. Steel & Spring Works, 73 Mich. 405, 41 N. W. 490. So an owner who presents plans and specifications which contain serious defects not patent to an ordinary mechanic, and not discoverable by ordinary diligence upon inspection, is liable to the contractor for damages resulting from such latent defects, where the plans are complex and involved, where the contractor is held to strict performance of specifications, and where the owner through his architect or engineer retains a controlling direction and supervision exclusive of direction in the contractor. In such cases the guaranty raised by the law is that the architect or engineer has sufficient learning, experience, skill, and judgment properly to perform the work, and that such plans, drawings, and specifications are suitable and efficient for the purpose designed. If they fall short of this, the owner is liable, and cannot shield himself behind the presumed skill and the advice of his agent, but such agent may be liable to his employer for shortcomings in the nature of malpractice. Bentley v. State, 73 Wis. 416, 41 N. W. 338.

Where the contractors build according to the prescribed plan furnished by the employer, they are not responsible for consequences resulting from any defect in the plan in a suit against them by the owner, as for a cistern that is not water tight (Porter v. Wilder & Son, 62 Ga. 520); or for insufficient strength in steel designed and specified (Murphy et al. v. Liberty Nat. Bank, 184 Pa. 208, 39 Atl. 143), or for a leaky reservoir (Filbert v. City of Philadelphia, 181 Pa. 530, 37 Atl. 545); if the contractor follows the plans and uses good material (MacKnight Flintic Stone Co. v. City of New York, 160 N. Y. 72, 54 N. E. 661; Bush v. Jones, 75 C. C. A. 582, 144 Fed. 942, 6 L. R. A. [N. S.] 774). Nor are contractors responsible for what may happen afterwards to a building if they have followed the plans and used proper material and good workmanship. Clark v. Pope et al., 70 Ill. 128. This would include the case of a building completed, but not formally turned over, if it collapsed from its own inherent weakness due to defective plans.

[3] A contractor, however, owes the duty to examine the plans and judge of their sufficiency, and may be bound by his contract even if parts specified be insufficient; especially is this true if he has made full examination and guarantees that the work can be done. Giles et al. v. Foundry Co. (Tex. Civ. App.) 24 S. W. 546. He is bound to discover defects that are reasonably discoverable or patent. Siebert v. Leonard, 17 Minn. 433 (Gil. 410). He is not excused by misunderstanding plans, as his entering into the contract implies that he understands. Clark v. Pope et al., 70 Ill. 128. All this is true if he

has experts at his command by whom the plans could be inspected and passed on (Thorn v. Mayor & Commonalty of London L. R., 1 Appeals Cases, 120); or has large experience and presumed competency, or holds himself out to have such, and the contrary is not known to the employer; or if the work is so simple that it cannot be presumed to have defects not readily discoverable to one who would undertake the work. Unforeseen difficulty, however great to the performance of a building contract, will not excuse a breach by the contractor. Dermott v. Jones, 2 Wall. 1, 7, 17, 17 L. Ed. 762; Simpson v. U. S., 172 U. S. 372, 19 Sup. Ct. 212, 43 L. Ed. 482. Bearing in mind the general principles thus laid down, what situation do we find presented by the case at bar?

A contract with the usual powers of inspection and discretion in acceptance of work and material, but with neither implied nor assumed control of the construction by the railroad company.

Plans concerning the ultimate efficiency of which there is a conflict in the testimony, with an apparent preponderance in favor of the conclusion that they were not adapted to the erection of an exceedingly stable building of such dimensions.

Practically a concensus of opinion that the building could have been erected by the contractors in full satisfaction of the terms of the contract by the employment of such braces as were actually used in the earlier stages of construction.

Plaintiffs had had years of experience as building contractors. They employed no engineers, and relied on their own judgment and the reputation of the defendant's engineering department; but they undertook in competitive bidding to do this specific work, and held themselves out as understanding it and able to perform it. The structure was as simple in plan as can well be conceived, and required no more than ordinary carpenter's skill to understand it. No fraud appears on the part of the defendant. The building, like a shed, was not intended to withstand severe strains, and it is practically conceded that its condition at the stage of collapse could not determine and fix the measure of its stability at completion. We are not concerned with whether it might have stood for a longer or shorter period in actual use, whether it might then have collapsed and injured third parties, or whether if it had collapsed after completion defendant could have recovered damages from plaintiffs, or plaintiffs could have recovered under the contract from defendant. No such questions are in this case, and the rules applicable thereto are not controlling here. This is a case of a contractor who has undertaken to erect a structure of simple plan, which concededly could have been built in safety by the employment of no extraordinary methods of construction, upon whom was imposed the duty of using reasonable precaution, and of keeping safe during the progress of the work what must at that stage have been less stable than at the period of completion. It appears almost conclusively that the contractors did not themselves exercise due care; and there is presented in the record an adjudication to that effect. In a case like this the question of latent defect, and therefore implied guaranty, is not present. The plaintiffs when they contracted must be presumed to have known what methods of con-

struction essential to safety must be employed, and whether they could afford such for the price at which they announced themselves willing to undertake the work.

It remains to consider whether the court in its charge correctly submitted the issues. Respecting this phase of the controversy it instructed in substance as follows:

(1) That there was an understanding or guaranty on the part of the defendant that the plans and specifications were suitable and efficient for the purposes designed.

(2) If the jury should find that the plans and specifications were not suitable and efficient for the purposes designed, then the following questions must be answered:

(a) Did the plaintiffs know, or in the exercise of ordinary care should they have known, that the plans were not suitable or efficient?

(b) Was the work prosecuted by the contractors in the exercise of ordinary care?

(c) Was the collapse caused solely by defective plans and specifications?

(3) If all these propositions were resolved against the defendant, then the verdict must be for the plaintiffs upon the second and third causes of action for the amounts therein claimed, with interest.

From the viewpoint of the trial judge the charge was clear and unexceptionable, but we are of opinion that the conditions did not justify the application of the principle first stated in so broad and absolute a sense. Whether the plans were suitable and efficient for the purposes—that is, of course, the ultimate purposes—designed, is not the crux of this case. The question is, Could this building have been safely erected in accordance with contract by the use of known or ordinary methods of construction? If it could have been, and the testimony is unanimous to that effect, then we are not concerned with the extent to which experts may differ as to the ultimate virtues of the plan and efficiency of the structure. The original premise was wrong as applied to the facts in this case, and was distinctly prejudicial, because the jury may have been, and probably was, influenced by the fact which clearly appears that the building was not and was not intended to be one of stanchest resistance. This erroneous direction was several times repeated.

[4] The action of the court in directing a verdict on the first cause of action was correct. This claim was founded upon the same assumption as those embraced within the second and third counts, namely, that the defendant was responsible for all injuries resulting from the collapse of the building, because of alleged defects in plans and specifications. Apart from any consideration of the soundness of this proposition, no competent evidence was offered in support of the claim asserted in this first count. The judgment in the state court founded upon a petition charging negligence of the contractors, of a nature which was not and could not be negligence on the part of the railway company, was not binding upon the latter. Nor was the record evidence in that case admissible, either in form or substance, to sustain the issues in this case. The testimony of the other witnesses offered was clearly incompetent.

It follows from what has been said that the judgment of the trial court must be affirmed as to the first and fourth counts or causes of action; that as to the second and third causes of action the judgment must be reversed and the cause remanded for further proceedings in harmony with the views herein expressed. The costs in this court, in both cases, will be taxed equally against the parties.

It is so ordered.