FREEPORT TEXAS CO. et al. v. HOUSTON & B. V. RY. CO. et al.
(MIDLAND BRIDGE CO., Intervener).

(District Court, S. D. Texas. March 20, 1919.)

Consolidated Cause No. 88.

1. BRIDGES ☞20(4)—CONSTRUCTION—RECOVERY FOR WORK DONE.

A company contracting to complete a bridge cannot recover for work done on a structure which collapsed before its completion, except by showing strict compliance with the plans, that the structure fell solely because of this compliance, and that the company was not chargeable with notice of the defects, or that such a result was likely to occur.

2. BRIDGES ☞20(2)—CONSTRUCTION—MODIFICATION OF CONTRACT—FEDERAL STATUTE.

Act March 3, 1899, § 9 (Comp. St. § 9971), requiring modification of certain bridge plans to be approved by federal authorities, is inapplicable to a change which does not affect the location or obstructive nature of the bridge.

3. BRIDGES ☞20(6)—CHANGE OF PLAN—EVIDENCE.

In action to recover for work done on a bridge before it collapsed, evidence *held* to show that defendant railway company had consented to certain changes in the plans, although its chief engineer had not personally authorized the modification.

4. BRIDGES ☞20(4)—CHANGE OF PLAN—RECOVERY ON CONTRACT.

Plaintiff company cannot recover for work done on a bridge which collapsed before it was completed, upon the ground that the collapse was due to a defective change in the plans, where plaintiff proposed the change and the owner, relying on the bridge company's recommendation, consented to it.

5. BRIDGES ☞20(4)—CONSTRUCTION—RECOVERY.

Plaintiff cannot recover for work done on a partially completed bridge upon the ground that the bridge's collapse was due to following the owner's plans where collapse was partly due to plaintiff's use of faulty material and improper methods of work.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

6. BRIDGES ⊛⟶20(4)—CONSTRUCTION—RECOVERY.

A bridge company, claiming that the collapse of a partially completed bridge was due to following changed plans and specifications, cannot recover for work done where it knew or was chargeable with knowledge that the changed plans were dangerous and could easily have provided against the danger.

In Equity. Suit by the Freeport Texas Company against the Houston & Brazos Valley Railway Company and others, in which the Midland Bridge Company intervened. Judgment denying intervention.

Scarritt, Scarritt, Jones & Miller, of Kansas City, Mo., for intervener.

A. R. Masterson and Andrews, Streetman, Logue & Mobley, all of Houston, Tex. (John A. Mobley, of Houston, Tex., of counsel), for defendant.

HUTCHESON, District Judge. This matter is before the court on exceptions of the Midland Bridge Company to the report of the special master denying the intervention of that company.

The matter at issue springs from the making and partial performance of a bridge construction contract entered into on July 1, 1914, between the Bridge Company, intervener, and the Houston & Brazos Valley Railway Company and Brazoria county. The Bridge Company, as contractor, agreed with the Houston & Brazos Valley Railway Company and the county of Brazoria, Tex., as owners, to build a bridge across the Brazos river between Freeport and Velasco, Tex., about four miles from the Gulf, in accordance with certain plans and specifications therefor which were prepared by the owners through their engineers, and which were attached to and made a part of the contract. This contract expressly gave the right to the owners to modify and change the plans and specifications, and to designate and direct, within certain limitations, the quality of work and material to be done and supplied, and the contract price was to be determined by the quantity done or supplied, as the price was to be determined on a piece price basis.

The contractor proceeded with the work, and constructed three concrete piers on and from the Velasco side. Pier 3, being a pivot pier located about one-third of the way across the river, was intended to support a revolving steel span 290 feet long, and that pier was entirely completed, and so much of the steel revolving span as connected Pier 2, which was at the shore line, with Pier 3, and extending two members beyond Pier 3, were completed, when, on May 7, 1915, this Pier 3 toppled over and fell into the river, carrying with it the steel span attached to it, creating a condition of obstruction to navigation and total loss of the steel unless removed. Intervener contending that the fall of the bridge was due to no fault on the part of it, but totally to defective plans furnished by the owner, and that, therefore, it was not responsible for the fall, and the defendants denying this and asserting that the responsibility for the fall and consequent loss was chargeable to the Bridge Company, it became immediately apparent that a serious, and

⊛⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

perhaps long drawn out, controversy would develop. The parties to the construction contract thereupon, for the purpose of making some progress in taking care of the physical situation thus developed by the presence of the steel in the stream, did, by their written contract, dated June 21, 1915, in four paragraphs agree as follows:

Paragraph 1 provided that—

"The contractors will begin at once and diligently prosecute the work of taking the steel composing the span recently erected as a part of the combination railroad and wagon bridge over the Brazos river between Freeport and Velasco in Texas, and now in the bed of the river near the site of the bridge, from its present location and of removing the same to the river bank at or near the Velasco end of said bridge site, * * * and the contractors will continue the prosecution of such work until it shall become plainly evident that the cost of taking further steel per unit will exceed the value thereof, or until the representative of the owners at the site of the work shall determine it to be impracticable to further prosecute the work, and shall in writing request the contractors to discontinue it."

Paragraph 2 provided for keeping cost account and the contract value of the work.

Paragraph 3 provided basis of calculation and time of payment.

Paragraph 4 provided as follows:

"Neither the fact that this contract has been entered into, nor that the work herein contemplated has been done, nor that it has been paid for shall prejudice or estop either of the contractual parties from asserting all the claims against each other, or any other person, which they respectively might otherwise assert, growing out of their relation to the previous history of the aforesaid bridge. The contractors claim and assert, among other things, that they are in no way liable or responsible in law to the owners for the loss or damage that has occurred by reason of the fact that a part of the said bridge heretofore constructed did not stand up. The owners contend the opposite. If it shall hereafter be established or agreed by the parties interested, or if it shall be judicially determined that the contractors are right in their said claim and assertion, then the portion and amount of said contract value that they have by the terms of this contract agreed to bear shall be allowed and paid to them by the owners; and on the other hand, if it shall hereafter be established or agreed by the parties interested, or if it shall be judicially determined that the contractors are liable and responsible in law to the owners for the loss or damage that has occurred by reason of the fact that a part of the said bridge heretofore constructed did not stand up, then the portion and amount of said contract value that the owners shall have paid to the contractors under the terms of this contract shall be allowed and paid to them by the contractors."

The work was forthwith begun by the Bridge Company under this contract, and was proceeded with until all contemplated work was completed. Accounts of the cost of the work were kept and rendered biweekly as contemplated by the contract, amounting in all to $———, but at no time did the owners make any of the biweekly payments, or, in fact, any of the payments, as they had agreed to do. Hence, this intervention to recover that contract value, and to establish a lien therefor upon the receivership property. The Houston & Brazos Valley Railway Company interposed various pleas and demurrers, all of which have been waived and abandoned. They joined issue on the merits of the intervention, and also by cross-complaint sued for certain sums due them. The intervener asserted that both the original plan, which pro-

vided for a 35-foot foundation supported by piles if required by the engineer, and the changed plan, which provided for a 32-foot foundation and 21 piles (which change they allege was by the authority, if not the direction, of the Railway Company and its engineers), were fundamentally defective. That they built the bridge in strict accordance with the plans as originally made, except where changed as above, without fault of any kind on their part, and that the building of the bridge in accordance with such plans was the sole cause of its fall. The defendant contended, first, that the burden was on the intervener to establish its contentions, and that it had not only failed to do so, but that the proof had shown affirmatively, first, that the original plan was not defective, second, that the change in the plan was unauthorized, and, third, that neither the original plan nor the changed plan would alone have caused the fall but for the use by intervener of defective concrete in the pier, and of defective methods in making the excavation in the bed of the stream near the pier; the master agreeing with the contentions of the defendant that the change in the plan was unauthorized, that the excavation in the stream was dangerous and improper, and that there was defective concrete in the pier, both contributing causes of the fall, found that the intervener was not entitled to recover on its claim, and that it was due the defendant and its receiver the sum of $1,692.08, and so finding recommended that judgment go accordingly.

From this statement of the issues joined it appears that the case presents the now familiar aspect of a controversy between builder and owner, where, notwithstanding the fact that the structure which the contractor agreed to erect is not and never will be completed, the contractor claims recovery for the work and labor done on the contract, asserting that the failure to complete it is chargeable, not to his fault, but to that of the owner, in that the contractor faithfully followed the plans prepared by the owner; those plans being defective and impossible of execution. In some jurisdictions which, in this character of contracts, apply the contractual maxim that, "as a man binds himself so shall he be bound," to the completion of the structure rather than to the means by which it is to be completed, such a claim could not form the basis of a serious controversy, because these courts hold that, while it is true that the contractor has agreed to build by and in accordance with certain plans, it is equally true and of more controlling influence that he contracted, not for an incomplete, but for a completed thing, and that, until he completes and presents to the owner the thing contracted for, he has no standing in court. Illustrative of, and perhaps the leading authority on this line, is the decision of the Supreme Court of Texas, in Lonergan v. San Antonio Trust Co., 101 Tex. 63, 104 S. W. 1061, 106 S. W. 876, 22 L. R. A. (N. S.) 364, 130 Am. St. Rep. 803; Creamery Package Co. v. Russell, 84 Vt. 80, 78 Atl. 718, 32 L. R. A. (N. S.) 135; Chandler v. Wheeler (Tenn. Ch.) 49 S. W. 278. This line of cases seems to be bottomed, not only on the general principles of English common law, but on the vigorous authority of the United States Supreme Court, in the case of Dermott v. Jones, 2 Wall. 7, 17 L. Ed. 762. In other jurisdictions, of which Bently v. State, 73

Wis. 416, 41 N. W. 338, is perhaps the leading case, see, also, Schliess v. City of Grand Rapids, 131 Mich. 52, 90 N. W. 700; Huetter v. Warehouse & Realty Co., 81 Wash. 331, 142 Pac. 675, L. R. A. 1915C, 671; Pine Bluff Hotel Co. v. Monk & Ritchie, 122 Ark. 308, 183 S. W. 761. Such claim makes an issue, and, if the facts support the contention that the failure to complete was solely due to the defective plans, will sustain recovery.

By the federal Circuit Courts the middle ground seems to be taken, that while the contractor may claim relief if he shows that the defect in, or loss of, the structure was due solely to defective plans, this claim can only be asserted by him where he shows that he did not know, or ought not to have known in the exercise of reasonable care, of the defects therein and their consequences. Of this class of cases are Northern Pacific Railroad v. Goss, 203 Fed. 904, 122 C. C. A. 198, Ninth circuit, and Penn Bridge Co. v. City of New Orleans, 222 Fed. 737, 138 C. C. A. 191, Fifth circuit. Without undertaking to determine as a matter of first impression which of these various views is the sound one, this case will, because of the ruling of the Circuit Court of Appeals, this circuit, be determined in accordance with the last-named view.

[1] Tested by these principles, then, in order for the intervener to make a case, it must have shown, first, that the loss was due solely to defective plans furnished by the owner, and, second, that it did not know, and had no reason to know, that the plans were defective for the purpose designed. The obligation of the intervener being contractual to build and complete the bridge, it cannot hope to recover for a structure falling before completion, unless it brings itself clearly within the principle contended for it by presenting evidence of such clear and satisfactory nature that it establishes affirmatively, and not merely by suspicion or conjecture, first, that it complied strictly and exactly with the plan, second, that the structure fell because, and only because, of this compliance, and, third, that in the course and progress of the work it did not know, and was not charged with knowledge, of the defects, and that such a result was likely to occur because of them.

As to the first matter the intervener concedes that the bridge was not built in accordance with the original plan, but claims that the change in plan under which they were proceeding when the bridge fell was authorized by the owner, and therefore must be regarded from its legal aspects as though it was the original plan.

The defendant denies that the change in the plan was authorized or assented to, and that therefore the sole responsibility for the change and its consequences must be borne by the intervener.

On this question of the change in the plan, which in the hearing before the master was largely the storm center of the case, the master found specifically that one Thanheiser was the engineer of the Railway Company, within the meaning of the term "engineer" as used in the contract, that no change could be made in the plan without his personal approval, and that he did not approve. The master, therefore, though Banks, one of the representatives of the Railway Company, knew and approved of the change, and Tolman, the engineer for the county, also

knew and approved of it, found that the responsibility for the change must rest upon the intervener, since Thanheiser had not given his approval.

Upon this finding the master predicated his conclusion, in part, that the intervener should not recover, resting same upon two grounds: First, that the change in the plan, not having been approved by the Chief of Engineers and the Secretary of War, the same was in violation of section 9, Act of Congress of March 3, 1899 (30 Stat. 1151, c. 425 [Comp. St. § 9971]), as follows:

"That is shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of War:

"Provided, that such structures may be built under authority of the Legislature of a state across rivers and other waterways the navigable portions of which lie wholly within the limits of a single state, provided the location and plans thereof are submitted to and approved by the Chief of Engineers and by the Secretary of War before construction is commenced:

"And provided further, that when plans for any bridge or other structure have been approved by the Chief of Engineers and by the Secretary of War, it shall not be lawful to deviate from such plans either before or after completion of the structure unless the modification of said plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of War."

And that being such violation and therefore unlawful, prevented recovery, since the doing of an unlawful act which is the proximate cause of the loss will always deprive the doer of any rights which he otherwise would have had. Second, that, the intervener having changed the plan without authority, and the change being the cause of the fall, it could not recover even apart from the statute, since it could not exonerate itself from responsibility by claiming strict performance.

[2, 3] I have carefully and laboriously read the entire record in this cause, and, agreeing with the fact findings of the master, I have affirmed his recommendation and entered judgment accordingly. I cannot, however, agree with the master on his legal conclusions, that the failure of Thanheiser and the War Department to assent to the change in the plan is of controlling, or even material importance, in this case. While the theory of the master, that the failure to secure the approval of the War Department made the change unlawful, is ingenious and plausible, I do not think it more. It is a hard doctrine that civil contract rights shall be lost through the failure to submit to the War Department changes in plans when these changes do not affect the location of the structure or its obstructive nature in the stream by enlarging its size or changing its shape, and I cannot believe that the purpose or scope of the act referred to contemplates that the engineers shall pass upon the character and tensile strength of all of the material used in the structure. If the master is right in his view, it seems to me it would be necessary that every change, though involving only the substitution of one kind of cement for another, must be submitted to the War Department, and I cannot think it reasonable to hold that the Board of Engineers of the War Department act as consulting or

supervising architects in matters of bridge construction. Their only purpose and obligation is to pass upon the plans for structures in navigable streams to determine their effect upon streams from the standpoint of navigation, and not in any sense for the purpose of determining their structural or architectural efficiency. Nor do I agree with the master's legal conclusion, that the change in the plan was not assented to and approved by the Railway Company, although I do sustain his fact finding that Thanheiser did not consent to the change. So far as assent on the part of the company could have a bearing on the question, I think that it is sufficiently shown by the facts and circumstances, and that whatever consequences flow from such assent and acquiescence must be imputed to the Railway Company, because, in my judgment, it was not at all necessary that Thanheiser personally should have specifically authorized the change. The master, however, attaches more importance than I do to the question whether the change in the plan was authorized or assented to, because, under the circumstances, the assent by the Railway Company could in no manner avail the contractor.

[4, 5] The evidence overwhelmingly establishes that the change in the plan was not at the suggestion of the owner, but of the contractor himself; that the engineer, Tolman, who for the county agreed to the change, rested his agreement, not on his personal observation of the conditions, but upon the recommendation of the bridgemen, having the reputation of being skillful and accurate bridge builders of long experience; and the Railway Company, through Banks, gave the same assent under the same influence. Therefore, the change must be treated as a change made by the contractor and not the owner. It must be held that the contractor did not comply strictly and exactly with the plan of the owner, and that therefore, having failed on the first essential of the case, he cannot recover. Should, however, I be mistaken in this view of the law, and should the changed plan be treated, because of the owner's assent, as the owner's plan, still the intervener cannot recover, because the second obligation imposed upon him, to prove that the structure fell because, and only because, of the strict compliance with the plan, has not been established. The master finds, and his findings are sustained by the evidence, that a large part of the cement in the pier which gave way was of a bad and worthless character, not in accordance with the plans and wholly without sufficient tensile or supporting strength. That the construction of the pier and cofferdam was done in a dangerous and improper manner, calculated to produce the very result that followed, through excessive dredging and lowering of the subsoil at, and adjacent to, the pier, and that these defective and improper conditions proximately contributed to, and caused, the fall of the pier.

[6] While the master has made no finding on the third element of defendant's burden, it is as clear as the rest that it has failed to show that it did not know, and was not charged with knowledge, that such a result was likely to occur through the plans and methods adopted and employed. On the contrary, I find that, under all the conditions, the danger from the use of the changed plan was, or should have been, known to the contractor, and that it could have easily provided against

it by placing the proper number of piles in the stream, and that knowing, or being charged with knowledge of, this fact, it wholly failed to take the elemental and necessary precautions; all the testimony agreeing that a sufficient number of piles would have kept the pier up forever. The testimony is affirmative that the contractor knew the conditions surrounding the work as it progressed, especially the conditions caused by the excavation in the stream to obtain material to stop the leak in the cofferdam, and it was his duty to protect against the conditions caused by his own conduct, by providing an adequate number of piles. Finding, then, as I do, not only that the contractor has wholly failed to show with the clearness and certainty which the law requires when he seeks to evade responsibility for the failure to fully complete the contract, that the fall was caused by defective plans of the owner, but that the evidence, on the contrary, affirmatively establishes that the plan, if it was a cause of the fall, was only one of the contributing causes, and that, had the cement in the pier been in the proper condition, and the excavation in the stream not been made in the way and manner it was, the pier would have stood indefinitely, I sustain the master's finding and recommendation, and order judgment accordingly.