No. 23,452.

THE HEMAN CONSTRUCTION COMPANY, *Plaintiff*, v. WILBUR N. MASON et al., as the Board of Administration, *Defendants*, THE STATE OF KANSAS, *ex rel.* Richard J. Hopkins, as Attorney-general, *Intervenor*.

SYLLABUS BY THE COURT.

1. PUBLIC BUILDING CONTRACT—*Defective Material and Work—Responsibility of Contractor.* Specifications prepared by the state architect for the construction of a public building, and forming part of the construction contract, required that certain cement floors be finished according to the Master Builders' process, with material and by workmen furnished by a designated company, not the contractor. The specifications further required, in effect, that the finish be one-half of an inch in thickness, to bring the floors up from the concrete slab to the specified floor level. The designated company furnished material and workmen to finish the floors, but the workmen applied merely a "skim," in some places thicker than others, but generally of eggshell thickness only. As a result, the floors were uneven and full of waves, cracked and broke through when tapped or stepped on, and had holes in them. *Held*, the contractor was responsible for the defects in the floors.

2. SAME—*Vouchers Prematurely Issued—Warrants Should Be Canceled.* The state board of administration, the agent of the state in the construction of

the building, approved vouchers for the final portion of the contract price, the vouchers were audited, and warrants on the treasury for the amounts were issued and registered. Delivery of the warrants was withheld until the contractor should remedy the defects in the floors, which it never did. *Held,* the state, on the relation of the attorney-general, is entitled to have the warrants canceled.

Original proceeding in mandamus. Opinion filed February 10, 1923. Judgment for intervenor.

*Frank Doster, J. E. Addington, J. E. Larimer,* and *E. S. Quinton,* all of Topeka, for the plaintiff.

*Richard J. Hopkins,* attorney-general, *Charles B. Griffith, J. K. Rankin,* and *John G. Egan,* assistant attorneys-general, for the defendants.

The opinion of the court was delivered by

BURCH, J.: The action is one of mandamus, to compel delivery to the plaintiff of two executed, registered, and numbered warrants, based on approved and audited vouchers, for the final portion of the contract price for the erection of a public building at Emporia.

Originally the construction company sued the board of administration for the money now sought to be obtained through medium of the warrants. It was held the suit was against the state without its authority. (*Construction Co. v. Board of Administration,* 105 Kan. 291, 182 Pac. 386.) The construction company then brought this action, and the board of administration answered the alternative writ. A statement of the issues thus made may be found in *Construction Co. v. Mason,* 109 Kan. 373, 374, 198 Pac. 966. A demurrer to the answer made the point that the answer must be established, if at all, by parole evidence, which would contradict the records made by the board of administration, the state auditor, and the state treasurer. In response to the demurrer, the court said:

"While these officers probably cannot dispute any statement contained in the record made by them, the state is not concluded by that record if it does not recite the facts. The state, on the relation of the attorney-general, in this or in an action commenced for that purpose, may question the correctness of the record, and may procure a judgment preventing the delivery of the warrants if the facts alleged in the answer are true. The court therefore suggests that the state on the relation of the attorney-general intervene in this action and file such pleadings as may be necessary to enable the court to determine the truth of the matters alleged in the answer filed by the defendants." (*Construction Co. v. Mason,* 109 Kan. 373, 375, 198 Pac., 966.)

The state on the relation of the attorney-general intervened. The intervening petition set up substantially the facts contained in

·the answer of the board of administration, and prayed for cancellation of the warrants. The Honorable Oscar Raines was appointed commissioner to take the evidence and report findings of fact and conclusions of law. Findings of fact favorable to the state were returned, together with a conclusion of law that the warrants should be canceled. The plaintiff excepted to the findings and the conclusion, and the case is now before the court for determination on the pleadings, the evidence, the commissioner's report and the exceptions.

The plaintiff renews the contention made in support of the demurrer to the answer of the board of administration, and asserts the state is in no better position to resist delivery of the warrants than the board itself. The court decided the matter when it suggested intervention by the state, and does not propose to debate it further. The plaintiff can get an order from this court for payment to it, out of the state treasury, of $5,472.28, in just one way, and that is by proof of performance of contract entitling it to the money. A rule of evidence will not be accepted as a substitute for a cement floor in the building the plaintiff undertook to erect.

The specifications on which the plaintiff made its bid, and which became a part of the contract, contained the following provisions:

"FLOOR FINISH.

"The floors of the front entrance corridor, first floor rotunda, platform at entrance to auditorium on first floor, side corridors on first floor back to east and west sides of pilasters at main stairways, and the first stair landing, are to be of tile. In these parts the top of the concrete slab is to be leveled off to 1¼″ below the finished floor level.

"The floors of all other corridors, stair halls, loggia, toilet and wash rooms, and wherever else cement floors are shown or marked on the plans, are to be· of cement put down by the Master Builders' process as hereinafter specified; and in these parts the concrete is to be floated down to a level ½″ below the finished floor level.

. . . . . . . . . . . .

"CEMENT FLOORS.

"This includes all parts before specified to have cement floors, also the balcony and stair treads. This cement finish is to be made and put on as follows:

"*Application of Topping.*—The topping, which shall consist of one part fresh cement to two parts coarse, gritty, clean sand, mix (1:1½), shall at no time be made sloppy. Lay and straight-edge the topping to a true and even surface. The topping shall then be well floated with wooden floats to close all voids and hollows.

*"The finish.*—Then a dry mixture of one (1) part Master Builders' Concrete Hardener and one (1) part of tested Portland cement (by weight), mixed to an even color, shall be sprinkled evenly over the surface. This shall be floated in thoroughly and troweled. A second troweling shall be given surface when it has set sufficiently to take a hard, smooth finish. Under no circumstances shall the finish be applied when there is any sign of surplus water on the floated surface.

"The finish consumes approximately 15 pounds Master Builders' Concrete Hardener and 15 pounds cement per 100 square feet.

"Coloring.

"The finish shall be colored to a dark red by troweling the coloring material into the finish before it is set up, applying as many coats as may be necessary to produce a thoroughly even, dark color.

"Workmen.

"This topping and finish are to be applied by workmen skilled in this kind of work, furnished by the Builders' Material Supply Co., of Kansas City, Mo., or by some other company recommended by and under the directions of the manufacturers of this concrete hardener.

*"Safeguarding the Floor.*—After the topping has set up, the contractor shall cover it with a uniform layer of soft wood sawdust, shavings, or other suitable covering. This covering must not be applied until experiment shows surface hard enough to prevent covering from scratching or injuring the finish. Surface shall be kept wet for at least five days. Floors, if protected as above, will be ready for light traffic in a week, and for heavy traffic in three weeks, under favorable weather conditions."

Workmen furnished by the Builders' Material Supply Company applied topping and finish to the floors indicated. While the work was in progress, Lewis, superintendent of construction for the state, objected to Tate, superintendent of construction for the plaintiff, that the topping and finish were not being applied according to specifications. Lewis' recollection is that both Tate and Heman were present when objection was made to the workmen who were doing the work. The workmen persisted. Lewis, doubtful of his authority to stop the work, notified Tate, Heman, and the workmen, that it would be a question whether they would get the floor off their hands.

The departure from the specifications consisted in this: The specifications required topping and finish to be one-half inch thick, in order to bring the floor up to the floor level from the top of the cement slab. Instead of this, the topping was merely a "skim," in some places thicker than others, but generally of eggshell thickness. The result was that when finished the floor was uneven and full of waves, cracked and broke through when tapped or stepped on, and had holes in it from one-half to three-quarters of an inch deep. Besides that, the color of the floor was mottled red and white. It

looked as though plaster had fallen on the surface, and presented a very unsightly appearance.

The defects in the floor became manifest while construction of the building was going on. The subject was discussed with the plaintiff many times, and it said it would remedy the defects, but never did. The Builders' Material and Supply Company was appealed to, and it promised to rectify the work, but never did.

On July 1, 1917, the board of administration which had let the contract went out of office, and was succeeded by a new board. The affairs of the old board were not fully closed up until July 10, and that day was largely spent in discussing with the plaintiff what should be done about finishing and paying for the building. The board understood the appropriation to pay for the building would lapse unless warrants were issued as of June 30. The recollection of the president of the old board as to what took place at the meeting is given in his testimony, as follows:

"I think there were three men there representing the Heman Construction Company. . . .

"We talked it over from every conceivable angle. They wanted their money. They expressed a desire to fix the floor in some way. They were sure that the Builders' Supply Company were going to fix the floor, and urged us to pay over money. It was after the year, and after the money had really lapsed, and they were anxious to have this all closed up. We had an all-day session. They made many promises, and after going over the matter very fully—probably ten or twelve conversations—we finally told them we would do this: We believed they wanted to do the right thing about the building—fix it up. We thought it could be done. They were to go ahead and get the building fixed and get the floors fixed; do what there was on the outside, which was a comparatively small matter, and when they got it fixed they were to have their pay; and it was decided at that time we should issue this warrant. And we should issue the warrant and hold the warrant until such time as they should get this floor fixed up and complete the other things outside. And under that understanding, we did issue the voucher, and the warrant came back— my understanding was that the warrant was to be deposited in the state treasury until the building was in proper shape. The plaintiff said the floor was not right, and they asked the board to help get the Builders' Supply Company to make it right, and said they were trying out various ways of clearing it up."

Thereupon, vouchers in due form were approved and ordered paid, the approved vouchers were audited, and the warrants were issued and registered as of June 30.

The plaintiff paid the Builders' Material Supply Company for its material and work, and in all the discussions between state offi-

cials and the plaintiff and its representatives concerning the defective floors the plaintiff made no claim that the work was not its work but was that of the Builders' Material Supply Company.

As far back as *Construction Co. v. Board of Administration,* 105 Kan. 291, 182 Pac. 386, the court indicated that the plaintiff ought to be paid if its work was well and faithfully done, but not otherwise. In *Construction Co. v. Mason,* 109 Kan. 373, 198 Pac. 966, the court indicated it wanted to know the truth about the merits of the case. With the exception of a witness whose testimony will be discussed presently, the plaintiff confined its evidence to proof of records about which there was no dispute. It did not see fit to produce as a witness before the court's commissioner a single one of all its representatives, and the presumption is, there is nothing which they can say to its benefit about the construction of these floors, their condition, the causes of their condition, and all that has taken place since Lewis protested the manner in which the floors were being put down. Indeed, the court would be warranted in presuming that whatever the plaintiff might say would be to its detriment.

The defendant offered in evidence the answers to interrogatories sent to W. N. Rynerson, now of New York City, who was president of the Builders' Material Supply Company when it furnished the material and workmen to lay the floors in controversy. His testimony is abstracted as follows:

"Witness . . . was acquainted personally with Charles H. Chandler, state architect, and had some dealings personally with Mr. Chandler concerning the construction of the Plumb memorial building. Mr. Chandler came to see the witness prior to the time when he, as state architect, prepared the plans and specifications for this building, and talked to witness concerning their floor material, and made personal investigation of several buildings in Kansas City, the flooring of which had been constructed by the Builders' Material Company, and particularly a building erected by the Moriarty Bros., in Kansas City, Mo., and Mr. Chandler said he wanted that kind of a floor installed in the Plumb memorial building, and by witness' company. Witness testified that he cautioned Mr. Chandler particularly that red cement floors could not be depended on to be a uniform red, for the simple reason that free or hydrated lime in the cement, together with the alkali in the water and cement, would produce more or less efflorescence, and that no guaranty could be made as to the result of such flooring being a dark-red color."

When this testimony was given, Mr. Chandler was dead, and his voice may not be heard on the subject. It is a matter of common knowledge that many fine public buildings in different parts of

the state stand as enduring monuments to his ability as an architect. If the admonition which the witness says was given, were given, the state architect is convicted of stupidly or stubbornly going forward and preparing specifications for a building, itself a memorial to one of the great men of the state, calling for floors of thoroughly even dark-red color; and Rynerson undertook to produce such floors, using his own material and men. The conversation may have taken place, but the court declines to find that it did take place. A reasonable inference is that the floors were mottled because Rynerson's men did not properly trowel in the coloring matter, and did not apply a sufficient number of coats to produce the desired effect. (Specifications, "Coloring," supra.)

Although he had his money, it was to Rynerson's interest to relieve himself from responsibility for the condition of the floors, and the remainder of his testimony was devoted to showing that the defects were the necessary result of the architect's plans and specifications—use of Joplin flints or chats and metal domes. It is significant, however, that the witness omitted all reference to "skim" topping and finish of eggshell thickness. His testimony is not very consistent with the promise he made to Hackney and Hoch, members of the old board of administration, to rectify the work and put the floors in good condition, and his testimony is contradicted by testimony warranting the inference that the waves and cracks and holes in the floor resulted from disregard of specifications in completing them.

The court finds that the floors were not topped and finished according to the specifications forming a part of the construction contract, and that, as a result, the floors are materially defective.

The contract plainly required that the floors be finished according to the Master Builders' process, with material and by workmen furnished by the Builders' Material Supply Company. The plaintiff says its hand was held and guided in this respect by the hand of the state architect, and that the results are the work of the holding and guiding hand. Some cases are cited in support of this principle. One of them is, *Kansas Pacific Rly. Co. v. McCoy*, 8 Kan. 538, in which the court said:

"Where one party to a contract, in executing it, follows the direction of the other, the latter cannot complain of the manner of the performance." (Syl. ¶ 4.)

Another case cited is that of *United States v. Spearin*, 248 U. S.

132.   Spearin agreed to build a dry dock, according to plans and specifications, and, among other things, to reconstruct a sewer which intersected the site.   After reconstruction according to plans and specifications, the sewer broke, and flooded the dry dock.   The question was, who was responsible for the consequences?   In the opinion the court said:

"The sewer, as well as the other structures, was to be built in accordance with the plans and specifications furnished by the government.   The construction of the sewer constituted as much an integral part of the contract as did the construction of any part of the dry dock proper.   It was as necessary as any other work in the preparation for the foundation. . . . The risk of the existing system proving adequate might have rested upon Spearin, if the contract for the dry dock had not contained the provision for relocation of the 6-foot sewer.   But the insertion of the articles prescribing the character, dimensions and location of the sewer imported a warranty that, if the specifications were complied with, the sever would be adequate.   This implied warranty is not overcome by the general clauses requiring the contractor to examine the site, to check up the plans, and to assume responsibility for the work until completion and acceptance." (pp. 136, 137.)

Another case cited is that of *Bentley and others v. The State*, 73 Wis. 416.   The plaintiff contracted to build two wings of the state capitol, according to plans and specifications furnished to him.   The headnote of the case tells the remainder of the story:

"After the plaintiffs had in good faith constructed a large portion of one wing, and the materials and work had been approved by the architect, accepted by the board, and paid for by the state, the wing fell by reason of latent defects in the plans.   At the special request of the state the plaintiffs restored the wing according to amended plans and specifications furnished by the board.   *Held,* that the state warranted the sufficiency of the original plans, and was liable to the plaintiffs for the expense of restoring the portion of the building so destroyed."

In the opinion it was said:

"Under the contract, it is very manifest that, had the plaintiffs departed from such plans and specifications and refused to follow the directions of the architect, there could have been no recovery for the building of the south wing, even had they in the first instance built it as they were finally directed by the architect to do.   (p. 431.)

Another case cited is that of *MacKnight Flintic Stone Co. v. The Mayor*, 160 N. Y. 72.   The syllabus reads as follows:

"Where a municipal contract provides that the contractor shall furnish the materials and labor for the purpose, and accomplish a certain result, such as to make an underground room water tight, 'in the manner and under the conditions set forth in the annexed specifications,' and the specifications were prepared by the municipality and contain a detailed plan from which the

contractor had no right to depart, the contractor, in the absence of express terms or necessary implication, is not to be deemed a guarantor of the sufficiency of the plan and specifications to produce the result desired, and his contract is performed if he has furnished the materials and done the work according to the plan and specifications, and thus made the room as watertight as the plan and specifications permitted."

Other cases cited by the plaintiff are of the same tenor. In all of them, plans and specifications were strictly followed, and the unhappy consequences resulted from building with fidelity to them. In this instance, the plaintiff's hands were tied in just two respects: material, because of its peculiar properties; workmen, because of expert knowledge and skill in manipulation of the material. Depth of topping and finish were specified. That specification bore no relation, either to peculiar nature of the material, or to peculiar manner of handling in order to produce the desired quality of floor. With the designated material, manipulated by the designated workmen, the contractor engaged to bring the floor up from the concrete slab, a distance of one-half of an inch, to the prescribed floor level. To that extent, the plaintiff had full control of the workmen, and sanction might have been had from the architect, who had power to enforce obedience to specifications.

The state cites a case which makes the distinction between observance of specifications and utilization of prescribed material under prescribed superintendence quite clear. In *Fitzgerald v. Moran, et al.*, 141 N. Y. 419, the plaintiff sought to foreclose a mechanic's lien for plastering, and was defeated because he had failed to perform his contract. In the opinion the court said:

"It is not claimed that the plaster was mixed with equal parts of sand and cement as required by the specifications. But the plaintiff claims that in preparing the mixture he followed the directions of the agent of J. B. King & Co., the manufacturers of the cement, and that by his direction the mixture was made of two parts of sand to one of cement. The specifications in respect to the plastering, after providing that King's Windsor cement should be used, and that the work should be done under the direction of a superintendent of J. B. King & Co., in the next specification directed that the cement should be mixed 'with equal parts good, sharp and dry sand.' There is some evidence tending to show that the variation from the specifications in the proportions of sand and cement was directed by the superintendent of King & Co. But it is plain that the provision that the plastering should be done under the direction of the superintendent of King & Co. had relation to the manner of applying the plaster, and gave him no authority to change the component parts of the mixture specifically prescribed." (p. 420.)

So here. Responsibility for failure to comply with the specifications rests, not on workmen who were designated merely for their

understanding of material and skill in applying it, but on the contractor.

The evidence discloses promises by the plaintiff to fix the floors, and the commissioner finds that a promise to fix the floors formed one of the conditions under which the warrants were made ready for delivery. The court does not regard the subject as important, because the plaintiff expressly warranted against defects arising from departure from specifications. The contract reads as follows:

"Imperfect work, such as settlement, shrinkage, etc., of any description, resulting from the use of material of poorer grade than provided for in the specifications, or from a deviation from the construction as set forth by the plans, without authority and occurring within three months after the building is completed, shall be made good by the contractor at his own cost."

Elsewhere it was provided that plans and specifications taken conjointly were descriptive of the work necessary to be performed. Settling and shrinkage were mentioned by way of inclusion, and the reference did not restrict the meaning of the following words, "of any description." The expression, "occurring within three months after the building is completed," did not mean occurring after the building was completed and within three months from that time. It meant, occurring at any time but not later than three months after completion of the building.

"Imperfect work, .. . . of any description, resulting from . . . a deviation from the construction as set forth by the plans, without authority," embraces these floors. The plaintiff might have guaranteed the plans and specifications. It did not do so, and is not liable for defects resulting from faulty plans. Material furnished by the Builders' Company, and fashioned into a floor by Builders' Company workmen, were part of the specifications, and the plaintiff was not responsible if the result were disappointing, so far as it depended on these factors. Another specification, however, was that the floor should meet a requirement which did not depend on nature of material or manner of fashioning into a floor. Compliance with that specification the plaintiff did guarantee, and it ought to have made good the defective work, at its own cost, long ago.

The court finds for the state, and against the plaintiff. The judgment is that the warrants be canceled, and that the plaintiff pay the costs of the action.

Hopkins, J., not sitting.